### WARD v. HETH BROTHERS.

1. MASTER AND SERVANT—WORKMEN'S COMPENSATION ACT—CONTINUING DISABILITY—FINDING OF BOARD SUPPORTED BY TESTIMONY NOT REVIEWABLE.

   On certiorari to review an order of the industrial accident board refusing defendants' petition to be allowed to discontinue payments to plaintiff, the finding of the board that plaintiff was still suffering from the injuries for which compensation was awarded, which was supported by testimony, is conclusive, although the testimony was conflicting.

2. SAME—SUPERVENING INSANITY NOT GROUND FOR RELIEF OF EMPLOYER.

   After the liability of an employer to pay compensation to an injured employee under the workmen's compensation law has become fixed, no supervening infirmity or insanity of the employee will relieve the employer or his insurer from the liability to continue paying the compensation according to the terms of the award as originally made.

Certiorari to Industrial Accident Board. Submitted October 5, 1920. (Docket No. 19.) Decided December 21, 1920.

Herbert Ward presented his claim for compensation against Heth Brothers for injuries received in defendant's employ. From an order denying a petition for the discontinuance of payments under an award, defendant and the Ocean Accident & Guarantee Corporation, Limited, insurer, bring certiorari. Affirmed.

*Vandeveer & Foster,* for appellants.

*Corwin & Norcross,* for appellee.

STONE, J. Heth Brothers, the employers of the plaintiff, and one of the defendants in this proceed-

---

Authorities discussing the question of insanity as affecting right of employee to compensation under workmen's compensation law, are collated in a note in 6 A. L. R. 570.

ing, were engaged in the business of hardware and installation of heating apparatus in Grand Rapids, on February 12, 1916, and on that day were installing a furnace in a garage which was in the course of construction. The plaintiff, while assisting in the installation, and while engaged in lowering the furnace into the basement, received an injury to his right ankle joint, as the result of the giving way or collapse of the floor that he was standing on, and from which the furnace was being lowered. He fell into the basement and the injury was caused by a timber falling on his ankle.

In due season an agreement in regard to compensation was entered into by and between the plaintiff and the Ocean Accident & Guarantee Corporation, Ltd., insurer of the defendant Heth Brothers and likewise a codefendant in this proceeding. Under the terms of that agreement plaintiff was to receive $7.425 per week during his period of disability. Subsequent thereto, and on January 27, 1917, a supplemental agreement was entered into whereby the plaintiff was to receive $3.425 per week during disability. The reason that the compensation was diminished was due to the fact that when the original agreement was entered into plaintiff was totally disabled, and subsequently only partially disabled. Both of these agreements were approved by the industrial accident board.

On April 23, 1919, the plaintiff was declared insane by the probate court of Kent county and was ordered confined in the Kalamazoo State hospital, and said order was carried into effect. Thereafter and on November 25, 1919, George S. Norcross was duly appointed guardian of the plaintiff by the said probate court. On December 19, 1919, the defendant Ocean Accident & Guarantee Corporation, Ltd., prepared and filed a petition with the industrial accident board praying that as insurer of the defendant Heth Broth-

ers it be relieved from making any further or additional payments to the said plaintiff, or his duly authorized guardian, stating the following as reasons therefor:

After stating that plaintiff had been declared insane and committed to the State hospital the further reason was stated as follows:

"Your petitioner states that the claimant is not now, and has not been from April 23, 1919, suffering from any disability due to his accident of February 12, 1916, and that said accident and the consequences thereof are in nowise to blame for his physical incapacity to do and perform work at this time; but that his present disability is due to his confinement from a diseased condition of the brain."

Testimony was taken on behalf of said defendant in support of its petition, and on behalf of plaintiff. After oral argument the industrial accident board, on March 27, 1920, made an order denying the relief prayed for by the said defendant in its petition. The case is here on writ of certiorari to review the said action of the board. It is both defendants' claim that they have fully performed and met the obligation imposed upon them under the statute and under the agreements in the instant case. We call attention to the following extracts from the testimony. Dr. William A. Stone, a witness sworn on behalf of the defendants, testified that he had been a practitioner for some 35 years, being a specialist in nervous and mental diseases, after having been for 24 years in State institutions for the insane. He testified that he had had experience in treating many cases of locomotor ataxia and mental paresis. His examination of the plaintiff was made on July 23, 1919, three months after the committal to the State hospital. Speaking of the condition of the plaintiff at that time the witness testified as follows:

"Physically, the nature of the organic disease was in the nature of locomotor ataxia with cerebral involvement. I just mentioned a cerebral involvement, but in addition there was paralysis of the left side of his face; his pupils were tightly contracted, he had Argyll-Robertson pupils, Rhomberg symptoms. The left eye had an internal strabismus; the muscles of the outside being paralyzed, turning the eye in. The tongue when protruded, did so to the right slightly, showing the paralysis of the left side of the tongue. He showed the other usual symptoms of locomotor ataxia; the knee reflexes were absent and he had incontinence of the bladder, could not hold his urine; clothes were all wet and there was general anemia accompanying such conditions. He had a slight slurring of his speech so that he could not pronounce certain difficult words.

"Q. How about his gait, Doctor?

"A. It was ataxic. He did not have control of the muscles of his legs, he would wobble.

"Q. Rather shuffling?

"A. Yes, ataxic gait. He couldn't tell where his legs were going without watching the floor.

"Q. Did you make an examination of his right leg particularly?

"A. We did. That was the instruction we had, to examine his legs, feet and ankles as to his injury.

"Q. Just what did you find?

"A. We found that the motions of his feet and ankles were perfect and devoid of any contraction or restrictions in any way as the result of his injury. There was a slight lack of flexion in the right foot, but no more than in the other, both were alike, although not as good as in a normal individual in prime health. But inasmuch as it was the same in both feet, the loss could only be attributed to the nervous disease.

"Q. How old a man was Mr. Ward?

"A. That I don't know.

"Q. Would you be able to estimate his age at all?

"A. Perhaps in the 40's.

"Q. Is it not true, Doctor, that in a great percentage, from 90 to 99 per cent. of the cases of locomotor

ataxia and this dementia, from which Mr. Ward was suffering, are the result of a disease?

"*A.* Yes, it is.

"*Q.* And would it be possible, Doctor, even in the highest realms of speculation, in any way to say that the injury in 1916 incited into action any germs which might have been lying dormant and thus bring about this condition which he is now in; the condition in which you found Mr. Ward?

"*A.* I do not think so.

"*Q.* In other words, it is not even probable?

"*A.* The two situations are entirely divorced and have no relation to each other.

"*Q.* From your examination would you say that Mr. Ward had entirely recovered from his injury of 1916?

"*A.* I should think he had.

"*Q.* That is, your examination showed no disability to the right foot or ankle which would be in any way caused by his injury of three or four years ago?

"*A.* Nothing that I could determine.

"*Q.* And any disability which might still exist in the right foot is to the same extent in the left foot, and is apparently attributable to the result of the nervous disease?

"*A.* Yes, to the nervous disease.

"*Q.* Have you ever heard, Doctor, of a case of mental disturbance, such as Mr. Ward is suffering from, resulting from a broken leg?

"*Counsel for Plaintiff:* We will concede that his mental condition was not in any way the result of his injury in 1916; that it is a case of general paresis, no doubt.

"*Counsel for Defendants* (continuing): The record indicates that Mr. Ward was a laborer in 1916, doing general laboring work; there was nothing skilled in his occupation; he was told to do certain things, helping move furnaces or whatever might come along in the laboring line. In 1918 he was employed by a hotel as a porter doing general laboring work. Would you say, Doctor, in your opinion, that if Mr. Ward was not suffering from his general condition of paresis and locomotor ataxia and this mental disturbance, that he would be able today to do general laboring work?

"*A.* Oh, yes.

"*Q.* That is, the injury to his ankle does not in any way stop him, or hinder him, from performing a general laborer's work?

"*A.* I would not think so."

On cross-examination Dr. Stone testified, among other things, as follows:

"*Q.* Are you prepared to swear that were it not for his organic nervous disease and its accompanying mental and physical disability, he would be able to perform his work at this time as well as he did before this accident in 1916?

"*A.* Well, perhaps nearly as well. I would grant you this. No man ever yet had a broken bone or suffered from any disease—pneumonia or anything else, that left him in the prime condition he was prior to any such accident or disease. You could have pneumonia and recover and still not be quite the same man you were.

"*Q.* The fact that this ankle was badly broken and possibly badly treated on the start has, as a matter of fact, left him in a worse condition than he was before the accident, has it not?

"*A.* Speaking in general, yes. That would be my testimony regarding any fracture, but he would be able to perform his duties. Thousands of men do that after fractures and unless the disability has been a gross fracture and grossly treated, it leaves usually a broken bone in such condition that a man can do his ordinary labor or work without any difficulty, but, as I said before, no fracture ever leaves the conditions precisely as they were before.

"*Q.* One of the results of this fracture of this ankle would logically be to weaken the ankle, would it not?

"*A.* Logically so, I might say to supplement that, that in this particular case we could not determine any difference. * * *

"*Q.* I don't want to impose on you, Doctor, but let us wipe out the fact that he has general paresis, and assume that so far as that condition is concerned it does not exist, you are not prepared to say that if this man were out where he was required to perform hard

manual labor, for eight or ten hours a day, that he might not still have difficulty in performing that work because of the condition of his ankle?

"*A.* No, I wouldn't be prepared to say that he might not; sometimes they do and sometimes they don't.

"*Q.* You don't know what his condition was just prior to the disease having progressed to a point where he was committed to the State hospital?

"*A.* That is coincidental with the injury."

Dr. Dan H. Eaton, who had practiced his profession for more than 15 years, having been sworn as a witness on behalf of the defendants, and who assisted Dr. Stone in making his examination of the plaintiff on July 23, 1919, at the Kalamazoo State hospital, testified, among other things, as follows:

"*Q.* As a result of your examination of July 23, 1919, the condition of his ankle as compared with his left ankle and as compared with the normal foot and as compared with persons who have suffered fractures of a similar nature and have recovered, would you say that Mr. Ward had recovered from the injury to his ankle which was occasioned in 1916?

"*A.* Judging from our examination, both from the physical examination of the part and inspection and from what the man showed us that he could do, I would say that his recovery was as complete as you could expect from any injury of that sort and that his functions, except from a slight restriction in flexing the joint, were as good as results from any fracture.

"*Q.* The record indicates that in 1916 Mr. Ward was a common laborer, not a skilled workman, doing general laboring work, whatever that work happened to be, whether it happened to be to move furnaces, if it was carrying building materials, he did that; just a general laborer. That has been his work, and in 1918 he was employed by a hotel for some time as a porter doing general porter work. Nothing skilled in the work, just laboring, working about a hotel. Would you say, Doctor, in your opinion, that Mr. Ward had recovered physically sufficiently so that he could return to a general laborer's duties?

"*A.* Yes, sir, judging from my examination.

"*Q.* Upon your examination, Doctor, you found that he was suffering from other physical and mental troubles, did you not?

"*A.* Yes, sir.

"*Q.* And your answers so far have been regarding the injury to his foot and not taking into consideration the general physical condition of Mr. Ward.

"*A.* Yes, sir.

"*Q.* In your opinion, Doctor, does that general physical condition result in any way from the injury he received in 1916?

"*A.* No, sir.

"*Plaintiff's Counsel:* We will concede that to shorten it up.

"*Q.* So that if it was not for his insanity and the condition of locomotor ataxia which is present, Mr. Ward, in your opinion would he be capable of performing a general laborer's duties?

"*A.* Yes, sir.

"*Q.* You examined his foot and ankle carefully?

"*A.* Yes, sir.

"*Q.* And you found the condition of the bones as good as could possibly be expected in the case of a fracture?

"*A.* Yes, sir.

"*Q.* The movement of the foot was perfectly normal to the extent of lateral motion?

"*A.* The flexion of the foot was somewhat restricted, but it was about the same in the other foot, so that when we had him move the foot in different directions, the right foot was about the same as the left.

"*Q.* So that if there is any restriction in the right foot, practically the same is present in the left?

"*A.* Yes.

"*Q.* And would probably result from the same cause?

"*A.* Yes, from the organic disease from which he is suffering.

"*Q.* Did he seem to be suffering from any pain in the foot at the time of your examination?

"*A.* He claimed not. He said he had not suffered from any pains since having received some injections shortly after his commitment to the hospital.

"*Q.* In just what way did he indicate to you that he was suffering no pain?

"*A.* He walked on his toes and the balls of his feet and danced.

"*Q.* How far did he walk that way?

"*A.* Around the room; in a fairly good-sized room.

"*Q.* Did he seem active when he did that?

"*A.* Yes, he danced up and down on his feet.

"*Q.* Did he swing his foot in a circular way?

"*A.* He demonstrated that he had all motions; he sat in a chair and whirled his feet around and we put his feet through all the motions that we could expect.

"*Q.* Did he rise on his toes?

"*A.* On the balls of his feet.   *   *   *

"*Q.* He danced around and whirled his foot in a circular way and went through all of the motions that a normal foot would naturally move?

"*A.* Yes, with that one exception of flexion of the foot and that was restricted about the same in both feet.

"*Q.* What percentage below normal?

"*A.* I wouldn't attempt to say now.   We could notice that that foot movement was restricted and asked him to put the other foot through the same movement and the restriction was about the same.

"*Q.* Do you attribute that restriction to his ataxic or mental or general physical condition?

"*A.* To the nervous disease.   *   *   *

"*Q.* In your opinion what is causing Mr. Ward's physical condition today?

"*A.* Locomotor ataxia with cerebral involvement.

"*Q.* Contributed to in any way by the injury to his ankle?

"*A.* No, sir."   (This is a part of the direct testimony of this witness.)

Upon cross-examination he testified in part as follows:

"*Q.* Earlier in your testimony, Doctor, you said this ankle was not in as good condition as you would expect an ankle to be that had been broken or injured such as this one was?

"*A.* Yes.

"*Q.* Just what do you mean by that?

"*A.* I mean that you take an ankle joint or a fracture near any joint, and although the X-ray might show perfect results, I couldn't swear that such a joint would be perfect in its functions without having seen the man work with it and be on it.

"*Q.* In other words, although as you say, there had been a complete recovery or complete union, the flexions might thereafter be permanently impaired or the articulation (I think you call it) be impaired and be a permanent weakness there?

"*A.* It is possible without doubt, but our examination of an hour and a half did not disclose it.

"*Q.* A portion of which time at least you were devoting your time to something else?

"*A.* Yes.

"*Q.* You don't know the condition of this ankle when Mr. Ward was admitted to the hospital?

"*A.* No, sir.

"*Q.* You had never seen him before July 23, 1919?

"*A.* No, sir.

"*Q.* It is altogether probable, is it not, assuming that an injured ankle has recovered as nearly as can be, that he might be able to do small jobs of porter work around a hotel and yet might be entirely unable to do hard manual labor such as moving furnaces and carrying heavy iron and steel bars and work of that sort?

"*A.* Well, of course, following any injury of that sort we advise that they do light work and gradually work up to their regular work. My statement was, I believe, that as far as anything we saw, it is my opinion that there is not any reason that the man should do his regular work, but I wish to add that if he has never worked to any extent on that ankle he could not do regular work without working up to it.   *   *   *

"*Q.* But it is entirely probable, is it not, that although there is as complete a recovery as can be expected in cases of this sort, that the ankle may have been so impaired and weakened that while he is able to do porter work around a hotel, he is not able to go out and do hard manual labor?

"*A.* I would consider that he would be as capable on his ankle as from the rest of his physical condition.

"*Q.* Assuming that his physical condition is all right and has been all right?

"*A.* I would say at this time he could do regular work on his ankle if his general physical condition had been good and he had been gradually working up to it. * * *

"*Q.* A fractured joint in a person forty years of age or more is generally weakened thereafter, is it not?

"*A.* It is never as good as before it was fractured.

"*Q.* Never as good as before?

"*A.* Never 100% normal."

Dr. S. Porter Tuttle was examined at Grand Rapids on behalf of the defendants. He had been appointed by the probate court to examine and determine as to the insanity of the plaintiff. He testified that he had been in the practice for 20 years and was a graduate of the University of Michigan. This witness had examined the plaintiff immediately after the injury in 1916. He testified in part as follows:

"*Q.* Just what was that injury, Doctor?

"*A.* The injury consisted of a fracture of the *os calcis* or prominent bone forming the heel, sometimes spoken of as the heel bone.

"*Q.* Any other injury that you found present there?

"*A.* No, sir; that was the only injury, was the fracture. He claimed to have some injury to the joint, but the only injury we could discover at that time was the fracture by a careful examination and taking X-ray plates. (The plates referred to were marked Exhibits 1 and 2.)

"*Q.* Do you recall having taken those X-ray pictures?

"*A.* Yes, sir.

"*Q.* You did it yourself, Doctor?

"*A.* Yes, sir.

"*Q.* I show you one and ask you what your reading of that plate would be?

"*A.* That shows the fact that there was no injury to the joint structure or to the bones of the leg or foot, and the dark picture here shows the injury to have been of the *os calcis* here; it also does not show any other injury here; but this is another picture and

shows that there was no injury to those bones there, or to the bones here, but this does show the injury here.

"Q. The place of the injury?

"A. Right here, the *os calcis.*

"Q. The frayed edge there?

"A. Yes, sir.

"Q. It shows no injury to the ankle joint?

"A. No, sir.

"Q. At the time you made your examination in 1916, Mr. Ward, as I understand it, was walking at that time with a cane?

"A. Yes, sir.

"Q. Did you find any evidences of falling arches?

"A. Yes, he had both fallen arches; both feet were flat; in other words, he was flat footed, both feet.

"Q. Were there any other evidences of any general debilitated condition at that time?

"A. Yes, he was a very much debilitated man. The uninjured ankle, or the left ankle, was really in the worst condition, in a worse condition so to speak, than the right, and there was less motion in the left ankle than there was in the right.

"Q. As to subjective symptoms, did he give any subjective symptoms of a debilitated condition or general run down condition?

"A. Yes, sir. He was run down and generally debilitated.

"Q. Did he complain of any pains?

"A. He complained of severe pains in the legs.

"Q. What was the nature of these pains?

"A. Sharp lancinating pains.

"Q. From the hips down to the feet?

"A. From the hips down to the feet.

"Q. That in your opinion indicated what?

"A. The sharp lancinating pains in his legs, together with other symptoms which he had and tests which I made, led me to make a diagnosis of locomotor ataxia. (After describing the symptoms the witness added:) Those were all symptoms of locomotor ataxia; he had every one of them."

The witness' last examination of the claimant was on March 5, 1918. Referring to that examination he testified as follows:

"*Q.* At that time did you make a careful examination of Mr. Ward's right ankle?

"*A.* Yes, sir.

"*Q.* What did you then find was the condition of his ankle at that time; that is, if there was any evidence of an injury there?

"*A.* Very slight, indeed, and it seemed to me that there was not enough evidence there of injury to cause the disability claimed by the injured.

"*Q.* Did you make an examination of the union of the broken bones?

"*A.* Yes, sir.

"*Q.* Was that union as complete as would naturally be found in the average individual?

"*A.* Yes, sir.

"*Q.* In other words, his recovery from the fracture was a normal recovery?

"*A.* I should consider it was, yes."   *   *   *

In the course of his cross-examination this witness testified, among other things, as follows:

"*Q.* Do you know that at that time the ankle, if he used his foot for any length of time, the ankle would swell to such an extent that he would have to get off his feet?

"*A.* I know that he made that statement, but I was never able to discover any swelling myself.

"*Q.* You never did see this ankle when it was swollen?

"*A.* I think the first time I saw it, it was slightly swollen, which might have been due, and probably was due, to rheumatism rather than the injury.

"*Q.* You don't know then that at the very time that he was brought into the detention hospital the ankle was badly swollen and caused him considerable trouble, that right ankle I am referring to?

"*A.* That might have been the case and still be due to either the rheumatism or the disease from which he was found to be suffering.

"*Q.* It might also have been caused by this fracture, might it not?

"*A.* There is a bare possibility, but it is so remote and so late that I would almost say it would not be; it was too far advanced.

"Q. Isn't it a fact people many times have trouble for years to come from fracture of a joint or union?

"A. That is in case where there is an ununited fracture, but this had united, and also this fracture was the outer portion of the *os calcis*, which does not articulate with any other bone. If it had been directly in the joint then I would have to say 'yes' to your question, but this being on the outer portion of the bone it probably would not have a great deal of influence on the joint itself.

"Q. This bone, however, with the bones of the front portion of the foot, carries the load of the body, does it not?

"A. Yes, sir.  *  *  *

"Q. Isn't it also possible that he might have trouble from this heel at this date, or let us date it back to April 23, 1919?

"A. Well, there is a bare possibility, yes.

"Q. You wouldn't want to say that he might not have trouble with it?

"A. No, I wouldn't want to say that, because anything might occur.

"Q. Going on the premises that many times a fracture of this sort does materially interfere for many years to come?

"A. Yes."

Dr. George H. Baert of Grand Rapids was also sworn to testify on behalf of the defendants. He made his only examination of the plaintiff on June 14, 1918. He testified, among other things, as follows:

"Q. Did you make an examination of the injury to the right foot?

"A. I did.

"Q. At that time did you find any swelling in the right foot?

"A. There was no swelling there.

"Q. Was there any swelling in the left foot?

"A. I examined, of course, both feet, and I found that the right foot, the one that had been injured, appeared to be more nearly normal than the left foot.

"Q. Anything abnormal about the foot was of what nature?

"*A.* The man had flat feet.

"*Q.* That condition existed—?

"*A.* And the left foot was a little worse than the right. * * *

"*Q.* Did you have him move his foot through the various motions?

"*A.* Yes, in every direction. Yes, sir.

"*Q.* You found those motions in what condition?

"*A.* If anything the movement of the right foot— well, it was just as good as the left, but the left foot seemed to be a little more flat than the right.

"*Q.* Did you have him walk around the room?

"*A.* Yes, had him stand on one foot and then on the other.

"*Q.* Did you make an examination of the ankle and the various parts of the foot?

"*A.* Yes, with my hands, a manual examination.

"*Q.* What did your examination disclose?

"*A.* I could find nothing more abnormal in one foot than in the other, excepting that the left foot was a little more flat than the right, and I thought that the right foot was the better foot of the two."

Upon cross-examination this witness testified in part as follows:

"*Q.* You are not prepared to say that that one examination would reveal to you beyond question that he might not have trouble from that ankle or that *os calcis* if he went into hard manual labor?

"*A.* No, I couldn't say that. If one has had any injury to any part—if they should have rheumatism it might affect them more in such parts than any other.

"*Q.* It always attacks the weakest part?

"*A.* Yes, sir.

"*Q.* Isn't it perfectly possible that this man's ankle joint might have been injured?

"*A.* Yes, that is quite possible.

"*Q.* And that it might cause him trouble periodically at frequent intervals even?

"*A.* Yes.

"*Q.* And might at the particular time that you examined him have given no evidence and be perfectly normal?

"*A.* Yes, that is right; that is correct.

"*Q*. It might be perfectly possible and altogether probable that this joint was injured?

"*A*. Yes.

"*Q*. And was causing him trouble from time to time frequently and still you might not have detected it upon your one examination in June, 1918?

"*A*. That is true.  *  *  *

"*Q*. You are not prepared to say that he might not be having trouble with this ankle today?

"*A*. No.  *  *  *

"*Q*. It is possible that that ankle might have been injured so as to cause him trouble without having actually been fractured, is it not?

"*A*. Oh, yes.

"*Q*. The X-ray taken of it would reveal no fracture?

"*A*. No injury to the synovial membranes or ligaments."

The only other testimony in the case was that of the son of the plaintiff, and that of an attendant at the detention hospital at Grand Rapids, where the claimant had been taken care of for a number of days before he was taken to Kalamazoo. The son, a young man 24 years old, testified to having been with his father a number of times each week after July, 1917, and to have observed the condition of his right ankle at that time. He testified that at the time his father was taken to Kalamazoo, and for a short time prior to that, his right ankle was badly swollen and he could not lace his shoe; and could not get up and down stairs alone; that he would work a week and then be obliged to "lay off" on account of the trouble with his right ankle.

The attendant testified to the swollen condition of the plaintiff's right ankle, that he complained of it as bothering him at the time he was taken away; that he himself bathed the ankle on a number of occasions. The witness when asked to give the best description he could of it said:

"Well, it was swollen pretty bad and bothered him. He was only there a couple of days. I think he was there from the 21st to the 23d.

"*Q.* Did you observe him when he stepped upon the ankle, when he put his weight upon it?

"*A.* He was lame.

"*Q.* Did it appear to hurt him?

"*A.* I suppose it did. * * *

"*Q.* What was the appearance, what did you observe?

"*A.* Just as I told you, I saw the ankle was swollen. Of course it was a swollen ankle and you know it must surely hurt a man.

"*Q.* What did you observe when he got out of bed about his ankle? Did he step on it freely?

"*A.* Why no, he didn't.

"*Q.* How did he handle himself?

"*A.* He didn't handle himself very good, he couldn't, the ankle was so sore and swollen."

By the petition to be relieved from further payments, the issue is presented whether claimant was at the time of the hearing, and had been since April 23, 1919, suffering from any disability due to his accident of February 12, 1916.

It is the claim of appellants that the disability from which the plaintiff was suffering on April 23, 1919, and has suffered since that date was due to disease and not accident, and counsel in their brief say:

"It is admitted that claimant was suffering from a disease at the time of his accident, and that his confinement to the hospital was the result thereof. Even if claimant was suffering from the slight effects of an accident still, his inability to work is due to his insanity and consequent confinement. All of the witnesses agree that, notwithstanding the happening of the accident, the claimant would have become mentally unbalanced and confined, and that his present mental condition and confinement can in nowise be traced to the accident, nor is it directly or indirectly attributable thereto."

Counsel for plaintiff, after reviewing the testimony,

urge that it is clear that there was evidence of a contradictory nature to the allegations of the petition and also positive testimony that right up to the time of the commitment of the plaintiff to the State hospital he was still suffering from the injury of February, 1916. They say:

"Defendants' own witnesses on cross-examination all concede that he might still have trouble from the foot and ankle. Claimant's son and the attendant at the detention hospital testified that he did have trouble and was still suffering from the effects of the injury at the time of the commitment. The fact that up to the time claimant was committed to the Kalamazoo State hospital, defendant insurer never made any effort to have the supplemental agreement set aside, or to be released from its liability thereunder, is conclusive evidence that it considered claimant still entitled to compensation up to that date."

It is urged that from its order denying the petition the board must have found that at the hearing and at the date of admission to the hospital the plaintiff was suffering from the injury of February, 1916. And that there was competent legal testimony of a substantial nature to support this finding. The following authorities are cited by plaintiff: 2 Comp. Laws 1915, § 5465; *Rayner* v. *Furniture Co.*, 180 Mich. 168 (L. R. A. 1916A, 22, Ann. Cas. 1916A, 386); *Bayne* v. *Cartage Co.*, 181 Mich. 378; *Hills* v. *Blair*, 182 Mich. 26; *Holnagle* v. *Gas Co.*, 200 Mich. 132; *Homan* v. *Power Co.*, 200 Mich. 206, 208; *Jacobs* v. *Glasser & Hoffman*, 200 Mich. 473.

In the *Homan Case*, Justice FELLOWS, speaking for the court, said:

"If the finding of the ultimate facts upon which the award is based finds support in the testimony it is our duty to accept such finding as final, in the absence of fraud." Citing cases.

This holding has been announced by this court, in

similar but varying language many times, and has been held applicable where there was conflicting testimony as to a continuing disability from an injury. We are unable to say that there was no testimony in support of the finding of the board, and we do not think that it is our duty to weigh the evidence, under the statute, and our rulings interpreting it. Findings of the board which are supported by facts or inferences from testimony must be taken as true.

Counsel for plaintiff discuss the question whether the defendants are released from liability to pay compensation because of the supervening insanity of the plaintiff; and they urge in argument that after the liability to pay compensation has become fixed, no supervening infirmity or insanity of plaintiff will relieve the employer or his insurer from the liability to continue paying compensation according to the terms of the award as originally made. And the following cases are cited: *Eaves* v. *Colliery Co.*, 2 K. B. (1909) 73; *Harwood* v. *Colliery Co.*, 2 K. B. (1913) 158; *McNally* v. *Furness, Withy & Co.*, 3 K. B. (1913) 605; *Walsh's Case*, 227 Mass. 341 (116 N. E. 496).

We doubt if defendants really claim that, simply, the intervening insanity would relieve them from liability. We understand their real position to be that the disability from which claimant has suffered since April 23, 1919, was due to disease and not the injury of February 12, 1916. However, we are of the opinion that the position of plaintiff upon that subject is fully sustained by the authorities cited. In other words, that the supervening insanity of the plaintiff does not justify defendants in stopping payment of compensation.

The order of the board in denying defendants' petition is affirmed, with costs.

MOORE, C. J., and STEERE, BROOKE, FELLOWS, CLARK, BIRD, and SHARPE, JJ., concurred.