SOTOMAYOR v. FORD MOTOR COMPANY.

WORKMEN'S COMPENSATION—HAND INJURY—LEPROSY—PARTIAL DISABILITY—EQUALLY DIVIDED COURT.
Award of compensation for partial disability to employee who had suffered an injury to his right hand, been continued in employment at favored work until discharged, received compensation for a time, and reemployed at favored work until found to have leprosy and confined in leprosarium is affirmed by an equally divided court.

Appeal from Department of Labor and Industry. Submitted October 14, 1941. (Docket No. 44, Calendar No. 41,576.) Decided January 5, 1942. Rehearing denied February 11, 1942.

Ramon Sotomayor presented his claim against Ford Motor Company for compensation for injuries sustained in defendant's employ. On petition for further compensation for partial disability. Award to plaintiff. Defendant appeals. Affirmed by equally divided court.

*Welsh & Hill,* for plaintiff.

*Doelle, Starkey & Jones,* for defendant.

STARR, J. Defendant appeals from award of the department of labor and industry, entered December 27, 1940, granting plaintiff further compensation of $12.80 per week for partial disability. Such award reversed an order of the deputy commissioner denying plaintiff further compensation, on the ground that plaintiff's loss of wages "was due to his being confined as a leper and not because of any disability in his hand and forearm."

On about August 14, 1929 (sometimes stated in the record as September 14, 1929), while employed on a piston grinding machine in defendant's plant, plaintiff, an experienced workman, sustained accidental injury to his right hand. His injury was treated, and in a few days he returned to other work not requiring use of his right hand. He lost no compensable time and continued at favored work until he was discharged several months later.

In October, 1932, plaintiff filed application for compensation; and on January 23, 1933, the department determined that plaintiff had "suffered an accident which arose out of and in the course of his employment with said defendant," and awarded him compensation for partial disability at the rate of $12.80 per week, such payments beginning December 29, 1932. No appeal was taken. Payments were made until February 23, 1934, when the parties entered into a supplemental agreement, approved by the department, providing:

"And it is now hereby agreed that in the opinion of all the parties hereto, that disability has ended, and that because thereof payment of all further compensation shall stand suspended from and after February 15, 1934.

"It is further agreed that if further disability from such injuries shall hereafter develop, this agreement shall not bar plaintiff's rights to petition the department for such further and added compensation as he may be entitled to; that on the hearing of such petition the plaintiff shall bear the burden of proof, and the department shall determine such petition according to the facts."

In pursuance of such agreement plaintiff returned to work at defendant's plant and continued at favored work, one-hand jobs, until June, 1937, when he was found to have leprosy and was removed to the leper colony at the United States Marine Hospital, Carville, Louisiana. He has been confined there ever since.

On about February 3, 1939, plaintiff filed petition for further compensation, alleging, in part:

"Your petitioner further represents that because of the accident there is an atrophy of the muscles of the right hand and arm with a resultant effect on the nerves and muscles. That such condition was and is permanent and progressive. That in an effort to aid in rehabilitation, a supplemental agreement was entered into on February 23, 1934, suspending payments and petitioner was employed by the Ford Motor Company at such labor as he was able to perform until June 15, 1937. That from the date of said injury and to the present time and for the balance of his life, he will suffer the disability to a greater extent than on the date of said award. That since June, 1937, he has not had the employment as contemplated by the efforts of his rehabilitation, and is entitled to compensation from June 15, 1937, in accordance with the award heretofore entered."

Defendant filed denial of liability for further compensation, on the ground that the "disability (if any) is not the result of an accidental injury arising

out of and in the course of his employment," and that the "case is *res judicata* because of approved settlement receipt of February 23, 1934."

On April 23, 1940, the depositions of plaintiff, Dr. Hasseltine, and Dr. McCreary were taken at the marine hospital in Carville, Louisiana. The matter was heard before a deputy commissioner in June, 1940. Plaintiff testified, as shown by his deposition, that, when he returned to work for defendant in February, 1934, he could not do the same kind of work as before his injury; that his work was light work, one-hand jobs, hanging pistons on the line, picking up towels, doing some machine painting, greasing machines, picking up pieces of brass and steel; that on several occasions foremen or superintendents complained that plaintiff could not do his work satisfactorily and he was sent to the employment office and changed to other work; that at the time of his injury in 1929, he was paid $6.80 per day for grinding pistons; that, when he became ill in June, 1937, his pay was $7.40 a day; that his employment with defendant ceased when he became sick with leprosy in June, 1937. Plaintiff further testified:

"*Q.* At the time you signed the supplemental agreement, did you have the full and complete use of your right hand?

"*A.* No, I never had since I got hurt; it gets worse every day.

"*Q.* Did you have a lesser or greater use of your right hand at the time of signing the supplemental agreement than you had at the time of securing the award?

"*A.* About the same.

"*Q.* State whether or not you have at any time had the full use of your right hand since the date of the award.

"*A.* I have never had.

"*Q.*   State if you have had any difficulty in the use of your injured hand and arm from the date of the award to the present time.

"*A.*   My fingers are all crooked.   *   *   *

"*Q.*   State what difficulty, if any, you have had in the use of your injured hand from the date of the award to the present time.

"*A.*   I can't hold a pencil and anything I pick up I drop since two months after I got hurt.

"I can't use my hand to write and do other things and can't use it to work.   *   *   *

"*Q.*   Can you use your left hand freely?

"*A.*   Yes, for anything.

"*Q.*   How about your right and left legs?

"*A.*   They are all right.   *   *   *

"*Q.*   You say that you can't stretch out your fingers because of the injury you have received, is that correct?

"*A.*   Yes.

"*Q.*   You have said that the injury you received in 1929 is about the same now as it was then.

"*A.*   It is the same."

Dr. McCreary of the marine hospital staff testified, in substance, that plaintiff had been under his observation "continuously" and that he had examined plaintiff's injured hand several times; that in his opinion plaintiff's injury did not cause the leprosy and would not hasten its development; that the injury had no bearing on the disease of leprosy; that the condition of plaintiff's hand was about the same as, no better nor any worse than, when he was admitted to the hospital. Dr. McCreary further testified:

"*Q.*   Will you please state the condition of his right hand at the time of the physical examination?

"*A.*   There was a contraction of the hand, you might say a moderate main-en-griffe, as we say in leprosy, including all fingers.   There was atrophy

of the small muscles of the hand, the interosseous and lumbrical muscles; the skin was dry and scaley, and there was complete anesthesia to pain and temperature.

"*Q.* State what use at the time of the examination Mr. Sotomayor had of his right hand and arm.

"*A.* The use of the hand would be rather limited for work; he could with some effort dress himself; he could hold his tray going to the dining room but there was very little strength in the right hand. I don't know about the arm; the disability is in the hand instead of the arm. * * *

"*Q.* Could the difficulty sustained by Mr. Sotomayor at the time you examined him be caused by trauma? * * *

"*A.* Yes, it could.

"*Q.* State whether or not from your knowledge of the history of this case same was caused by trauma. * * *

"*A.* From my knowledge, I don't know. From the record there was an interim of seven years between injury and his admission here, and lots of things could happen."

Dr. Hasseltine, medical director of the United States Public Health Service at the marine hospital, testified that plaintiff's injury would not cause, nor would it hasten the development of, leprosy; that the scars on plaintiff's hand were probably caused by something other than leprosy; that plaintiff could get permission from the surgeon general to travel on a common carrier, with an attendant. Dr. Hasseltine further testified:

"*Q.* From your knowledge, could you give the reasons for any difficulty, if any, of Mr. Sotomayor in the use of his right hand? * * *

"*A.* There is evidence of nerve damage resulting in contracture of the fingers and loss of sensation in the hand and fingers. This interferes with the

execution of fine muscular movements and certain functions dependent on the normal sense of feeling in the skin of the fingers.

"*Q.* Is the present condition of Mr. Sotomayor's right hand caused by trauma?   *   *   *

"*A.* I cannot answer that definitely. It may be caused by trauma, by other conditions, or both.   *   *   *

"*Q.* Could you state, of your own knowledge, in the case of Mr. Sotomayor, if there has been any improvement in his hand since your first examination?

"*A.* The improvement is questionable; if any, it is so slight as to be negligible.   *   *   *

"*Q.* What effect, if any, would leprosy have on injuries of the kind mentioned in the case of Mr. Sotomayor?   *   *   *

"*A.* It might increase deformity and disability."

Dr. Brietenbach, witness for plaintiff, who examined him in December, 1932, testified:

"*Q.* What was the condition of the hand at that time?   *   *   *

"*A.* His history to me. 'His chief complaint, sensory motor paralysis of the right hand and forearm. Sort of a claw. What we call sort of a claw hand. My functional diagnosis was trophic degeneration due to nerve and muscle injury.

"That was the diagnosis I made.   *   *   *

"*Q.* The injury to the hand as you examined it in 1932, would you say that was—

"*A.* There were scars. Injury occurred in 1929. There were scars on his hand, and there evidently had been—in order to cause this atrophy of the muscles, and what we call a claw hand. That is a contraction of the ligaments. And the muscles at that time had become somewhat smaller, and up the arm there was some degeneration of the muscles. Of course, subjectively he complained of pain. That's a subjective thing. And objectively, there evidently had been some sufficient injury which had

gradually extended from the muscles of his fingers up into his forearm, and weakened it and made it smaller, and certainly he had no strength. We tried to have him pick up some things in the court. Do you remember, the judge handed him some things and he couldn't even hold them."

When plaintiff was being tested for leprosy in 1937, Dr. Brietenbach again examined him. He testified:

"*Q.* But as far as appearance of the hand, it looked about the same?

"*A.* About the same as I have ever seen it. He could not manipulate it with facility. The claw hammer effect was there.    *    *    *

"*A.* Personally I have no doubt at the time I examined him that he had a progressive atrophy of the muscles due to nerve injury. I didn't think there was any doubt about it, and I didn't think there was any doubt about it when I saw him again, and I didn't think there was any hope for improvement, and rather expected just from my knowledge of these things, it might even progress, and get worse."

Dr. Hunter, witness for defendant, testified that he examined and treated plaintiff in 1937, and after several months of treatment diagnosed his illness as leprosy. He further testified:

"*Q.* This claw hand you have told us about that there is atrophy of the muscles there.

"*A.* That is a contracture of the tendons. The tendons on the dorsum of the hand pulled back in such a way as to over extend the first phalanges— first bone in the fingers, and flex the others, giving the appearance of a claw. It resembles something of the ulnar nerve paralysis.

"*Q.* Now in leprosy you say it is known as leper-claw?

"*A*. Leper-claw.

"*Q*. How does leprosy affect the nerves or the control of the hand?

"*A*. Well, leprosy involving the nerves gradually produce an anesthetic effect on the nerves and they become paralyzed, and you get trophic degeneration, or trophic changes in the tissues that were supplied by these nerves, because the nerves are dead, and the nutrition of the tissues is changed. We call it trophic changes in the parts.

"*Q*. Do you feel that the claw hand that this man has was the result of a nerve injury due to trauma?

"*A*. After I made the diagnosis I understood the case clearly. At first I didn't understand just what was causing that in his hand. I couldn't see a scar or anything as evidence of trauma to account for it, and I didn't pay a great deal more attention to it until I finally made the diagnosis. Then I could see the whole picture was very clear. Symptoms of the hand, ulcerations, anesthesia, the facies, and all fit perfectly with the diagnosis of leprosy. * * *

"*The Commissioner:* And as I understand the question proposed by Mr. Starkey is in substance this: Could this accident of 1929 either have caused or precipitated the condition of leprosy found in May, 1937. * * *

"*A*. The injury would not have any effect at all on the leprosy. Vice versa, the fact that he was developing leprosy may have caused him to get the injury. Caused the anesthesia,—anesthetic effects on his hands and nerves due to leprosy might make him more susceptible to injury. * * *

"*Q*. Doctor, when you examined him in May, 1937, was there a disability in that hand?

"*A*. He had a claw hand effect, and I remember that time, him burning himself all the time with cigarettes."

The deputy commissioner denied plaintiff's petition for further compensation, saying:

"Petition denied because plaintiff's loss of wages from June 4, 1937, until the end of the 500-week period, to-wit, April 26, 1939, was due to his being confined as a leper and not because of any disability in his hand and forearm."

On review the department of labor and industry reversed the finding of the deputy commissioner and awarded plaintiff compensation for partial disability at the rate of $12.80 per week from June 3, 1937, to the end of the 500-week compensable period. The opinion of the department stated, in part:

"In 1932 he brought proceedings for compensation and on January 23, 1933, an award was entered giving him compensation at the rate of $12.80 per week for partial disability from December 29, 1932, and until the further order of the department. The award was not appealed from and he was paid compensation until February 15, 1934, when it was stopped in accordance with a supplemental agreement. *The plaintiff had not recovered from his disability at the time compensation was stopped, but was returned to work on that day by the defendant at work favoring his condition. He continued with the defendant at favored employment until June 3, 1937,* when he was found to have leprosy and he has since been confined in the leper colony at Carville, Louisiana. On February 3, 1939, he filed a petition for further compensation and Deputy Commissioner McAuliffe entered an award denying such petition and the matter is now before us upon the plaintiff's claim for review.

"The plaintiff seeks compensation for the period from June 3, 1937, the day of the last employment by the defendant, until the end of the 500-week compensable period. His leprosy is not related to the accident and has caused his confinement in the

Louisiana colony. *However, he still has a claw hand resulting from a nerve injury and this condition is disabling in and of itself independent of his leprosy.* It is not seriously disputed that the hand condition is disabling, but the defendant contends that it was due in the beginning to the onset of leprosy and not to the accidental injury. In our opinion, the defendant's position is not tenable for the reason that the question has already been adjudicated. The award entered January 23, 1933, was a final determination that the plaintiff's disability at that time was due to his accident. *Insofar as this case is concerned the disability then was the same as it is now, namely, a claw hand resulting from a nerve injury.* To find at this time that such disability was not related to the accident would be to reverse a former award and to grant a rehearing; this we are not privileged to do.

"If it was clearly apparent at this time that the cause of plaintiff's disabled hand was leprosy and not his accident, we might have the same situation that was presented in the case of *Romanchuk* v. *Ford Motor Co.,* 290 Mich. 673. However, in our opinion there has been no satisfactory showing in that regard. It is true that nerve injury causing a claw hand may be the first evidence of beginning leprosy, however, it is equally true that the nerve injury causing the claw hand might have been a purely natural development from the accident. The plaintiff was not found to have leprosy until 1937 or more than five years after the development of the disability. We do not know that the plaintiff had leprosy at that time. We do know that he had had an accident and are unable to eliminate it from the picture or to find that the leprosy was the sole cause. In our opinion, it has already been determined that the plaintiff's disabled hand condition is due to his accidental injury and we are bound by that adjudication.

"The plaintiff was working at the time his leprosy was discovered. He could have continued

working at his favored employment except for his leprosy. We do not believe this defeats his right to compensation."

The order of the department entered December 27, 1940, provided, in part:

"This cause having been heard by the department on appeal of the plaintiff from the award of the deputy commissioner entered on September 9, 1940, denying compensation to the plaintiff; after due consideration of the evidence taken and the arguments and briefs of counsel (the department having made a finding of facts and law) and it appearing to this department that the award made, as aforesaid, should be reversed;

"Therefore, it is ordered, that the award of the deputy commissioner should be and the same is hereby reversed and that plaintiff shall be paid by the defendant compensation for partial disability at the rate of $12.80 per week from June 13, 1937, and until the end of the 500-week compensation period."

Defendant, having obtained leave to appeal, contends (1) that plaintiff should be denied compensation for the reason that his loss of wages is due to disease rather than to injury; and (2) that the department of labor and industry, by failing to require plaintiff to submit to a physical examination, deprived defendant of "its day in court."

The department, by its award January 23, 1933, from which no appeal was taken, determined that plaintiff had suffered a compensable injury. The department, by its opinion and award of December 27, 1940, determined that plaintiff "still has a claw hand resulting from a nerve injury and this condition is disabling in and of itself independent of his leprosy." The department determined that plaintiff was continued by defendant at "favored employ-

ment" from the time compensation was discontinued in February, 1934, until he ceased work, because of his leprous condition, June 3, 1937. Such findings of fact by the department were supported by competent testimony and are conclusive. We review questions of law but not issues of fact, 2 Comp. Laws 1929, § 8451 (Stat. Ann. § 17.186); *Lynch* v. *R. D. Baker Construction Co.,* 297 Mich. 1; *Donahoe* v. *Ford Motor Co.,* 295 Mich. 422; *Neumeier* v. *City of Menominee,* 293 Mich. 646; *Smith* v. *Pontiac Motor Car Co.,* 277 Mich. 652.

By working at "favored employment" from February, 1934, until June 3, 1937, when he was found to have leprosy, plaintiff did not establish a so-called "earning capacity" at his former employment of grinding pistons or at any other work. The award of compensation was for the injury to plaintiff's hand; and his having worked at such "favored employment," though he was paid more than at the time of his injury, does not bar his right to compensation. *Smith* v. *Pontiac Motor Car Co., supra; Murray* v. *Ford Motor Co.,* 296 Mich. 348; *Donahoe* v. *Ford Motor Co., supra.* See, also, *McDonald* v. *Great Lakes Steel Corp.,* 268 Mich. 591; *Hood* v. *Wyandotte Oil & Fat Co.,* 272 Mich 190.

The fact that plaintiff is confined in the leper colony by health authorities and is thereby prevented from working at "favored employment" does not defeat his right to compensation for his continuing hand injury. The liability to pay compensation for partial disability has been determined by the department of labor and industry and the supervening leprosy and resulting confinement does not relieve defendant from such adjudicated liability.

In the case of *Ward* v. *Heth Brothers,* 212 Mich. 180, plaintiff, while receiving compensation for par-

tial disability, was committed as a mental patient to the Kalamazoo State Hospital. The defendant filed petition to be relieved from payment of further compensation, on the ground that plaintiff's disability and incapacity to perform work was due to his diseased brain condition and resulting hospitalization, and not to his accident. Mr. Justice STONE, writing for affirmance of the order denying defendant's petition, said, p. 198:

"Counsel for plaintiff discuss the question whether the defendants are released from liability to pay compensation because of the supervening insanity of the plaintiff; and they urge in argument that after the liability to pay compensation has become fixed, no supervening infirmity or insanity of plaintiff will relieve the employer or his insurer from the liability to continue paying compensation according to the terms of the award as originally made. And the following cases are cited: *Eaves* v. *Blaenclydach Colliery Co.,* 2 K. B. [1909] 73; *Harwood* v. *Wyken Colliery Co.,* 2 K. B. [1913] 158; *McNally* v. *Furness, Withy & Co.,* 3 K. B. [1913] 605; *Walsh's Case,* 227 Mass. 341 (116 N. E. 496, 6 A. L. R. 567).

"We doubt if defendants really claim that, simply, the intervening insanity would relieve them from liability. We understand their real position to be that the disability from which claimant has suffered since April 23, 1919, was due to disease and not the injury of February 12, 1916. However, we are of the opinion that the position of plaintiff upon that subject is fully sustained by the authorities cited. In other words, that the supervening insanity of the plaintiff does not justify defendants in stopping payment of compensation."

See, also, *Neal* v. *Stuart Foundry Co.,* 250 Mich. 46; *Williams* v. *Cwmaman Coal Co., Ltd.,* (1927) W. C. & Ins. Rep. 318, 20 B. W. C. C. 476 (Court of Appeal, Eng. [1927]).

In the case of *Romanchuk* v. *Ford Motor Co.,* *supra,* relied upon by defendant, the majority opinion stated, pp. 677, 678:

"The award made was for what was *ultimately* found to be the matter with plaintiff who had thought with good reason and claimed that something else was the matter."

Under such decision defendant could introduce proof that the condition of plaintiff's hand was due to his leprosy and not to the accidental injury. However, the department, after hearing proofs of the leprous condition, determined that the continuing disabled condition of plaintiff's hand was due to the injury; and such determination of fact is final.

Defendant contends that plaintiff, by failing to report in Detroit on February 28, 1939, for physical examination, forfeited his right to further compensation, and that the failure of the department to require plaintiff to submit to an examination deprived defendant of a full and complete hearing and of "its day in court."

Section 8435, 2 Comp. Laws 1929 (Stat. Ann. § 17.169), provides:

"After an employee has given notice of an injury, as provided by this act, and from time to time thereafter during the continuance of his disability, he shall, if so requested by the employer, or the insurance company carrying such risk, or the commissioner of insurance, as the case may be, submit himself to an examination by a physician or surgeon authorized to practice medicine under the laws of the State, furnished and paid for by the employer, or the insurance company carrying such risk, or the commissioner of insurance, as the case may be. The employee shall have the right to have a physician provided and paid for by himself present at the examination. If he refuses to submit himself for the

examination, or in any way obstructs the same, his right to compensation shall be suspended, and his compensation during the period of suspension may be forfeited. Any physician who shall make or be present at any such examination may be required to testify under oath as to the results thereof."

The record indicates that on about February 25, 1939, while confined in the leper colony, plaintiff received notice or citation from defendant to report in Detroit on February 28, 1939, for physical examination. The record does not contain copy of the notice or citation. There is no satisfactory proof as to when the same was issued or when it was served on plaintiff. During the hearing defendant's counsel stated:

"Our citation was dated February 23, 1939, instructing him to appear before Dr. Kennedy, at 10 Peterboro avenue, Detroit, Michigan, on February 28, 1939."

Plaintiff's counsel filed sworn petition for continuance, which stated, in part:

"Now comes the above-named plaintiff, by one of his attorneys, Clarence G. Hill, and respectfully shows unto the board* that the above-named defendant, as he is informed and believes, has full knowledge of the fact that the plaintiff is a leper and confined in the Lepers' Colony at Carville, Louisiana; that on, to-wit, February 25, 1939, the said plaintiff received a letter requiring him to be in Detroit on February 28 at 2 o'clock, p. m., for an examination by Dr. Charles S. Kennedy of 10 Peterboro street.

"Your petitioner further shows that the above information was received by him (counsel) on, to-wit, March 2, 1939, and at a time too late to arrange

---

* The powers and duties of the industrial accident board, here referred to, have been transferred to the department of labor and industry and the board abolished. See 2 Comp. Laws 1929, § 8312 (Stat. Ann. § 17.3).—Reporter.

for such an examination, should such be necessary under the law and rules of practice of this board* before a hearing.

"Your petitioner further prays the board* to continue the hearing on said cause to permit of a reasonable opportunity for the taking of any deposition that may be deemed necessary by the parties hereto and/or the commissioner hearing the cause and/or such examination as defendant is entitled to under the law involved in this case."

Plaintiff testified that he was willing to submit to a physical examination by defendant's physician, provided such examination be made under conditions with which he would be able to comply. So far as the record shows, plaintiff was given only three-days' notice to make preparations and to report in Detroit for examination. He could leave the leper colony and travel to Detroit only after having obtained permission from the surgeon general of the United States, and if accompanied by an attendant. It was apparently a physical impossibility for plaintiff to report for the examination on February 28, 1939, and he should not be penalized for his failure to do so. Plaintiff did not, we believe, under the above-quoted statute, "refuse to submit himself for the examination, or in any way obstruct the same." The record shows no further effort by defendant to obtain physical examination of plaintiff, though more than a year elapsed between the service of the citation on February 25, 1939, and the hearing before the deputy commissioner on June 13, 1940.

Counsel for defendant rely upon the case of *Sauch v. Studebaker Corporation,* 232 Mich. 147 (41 A. L. R. 863), in which we said, p. 152:

"The section involved here, requiring an employee claiming or receiving compensation for an indus-

---

* See footnote, *ante,* 122.—Reporter.

trial accident to submit himself 'to an examination by a physician or surgeon authorized to practice medicine under the laws of this State' *when properly requested* by his employer or the insurance company carrying the risk, distinctly provides if he *refuses to so submit* himself to 'or *in any way obstructs*' such examination his right to compensation '*shall be suspended,*' and his compensation during the period of suspension '*may be forfeited.*' * * * The statute contains no exceptions or qualifying language."

Such decision recognizes that the employee must be "properly requested by his employer or the insurance company" to submit to physical examination. We conclude that in the present case there is no proof that defendant "properly requested" plaintiff to submit to such examination.

The supplemental agreement between the parties on February 23, 1934, under which plaintiff returned to work at favored employment, is not, as contended by defendant, *res judicata* of plaintiff's right to further compensation.

The award of the department is affirmed; with costs to plaintiff.

CHANDLER, C. J., and NORTH and BUSHNELL, JJ., concurred with STARR, J.

BOYLES, J. There is no foundation in fact to support the finding of the department to the effect that plaintiff's disability to continue work from and after June 3, 1937, was due to an accidental injury received during the course of his employment. A mere statement of the admitted facts shows a complete absence of any testimony to support such a finding.

In 1929 plaintiff suffered a compensable injury to his right thumb while an employee of defendant. He continued to work for defendant and in 1933 was awarded compensation for partial disability arising out of the accident. The injury had developed into what is referred to in the record as a claw hand. In 1934 an agreement was filed, and approved by the department, that disability had ended and further compensation be suspended. Plaintiff continued to work for defendant until June 3, 1937. Although working at favored employment, plaintiff at that time was earning more than at any previous time. On June 3, 1937, plaintiff was compelled to quit work because he was found to be a leper. By reason thereof, he was removed to a leper colony in Louisiana where he has been continuously confined since. It is undisputed—in fact, the department found— that he could have continued working except for his leprosy. The plaintiff himself testified he never missed any work from 1934 to June 3, 1937, at which time he left because the doctor said he had leprosy. From 1934 to 1937 plaintiff was not receiving compensation and we have no finding of disability during that period. The case is readily distinguishable from *Neal* v. *Stuart Foundry Co.,* 250 Mich. 46, and *Ward* v. *Heth Brothers,* 212 Mich. 180, where the plaintiff was receiving compensation for partial disability when his employment was terminated, and the employer in each case petitioned to be relieved from further compensation. In those cases, loss of earnings (partial disability) was still traceable to and the result of the accident. See, also, *Barnot* v. *Ford Motor Co.,* 282 Mich. 37. In the case at bar, the injury to the hand and the reason for termination of employment, viz: leprosy, had no connection whatever with each other. The leprosy was not

caused by or traceable to the injury, and the disability in 1929, or any time previous to June 3, 1937, had no possible connection with leprosy. Were it not for leprosy, plaintiff could have continued to work at the same or similar employment, at the same or higher wages, in which event there would be no basis for a resumption of compensation.

The award should be set aside.

Wiest, Butzel, and Sharpe, JJ., concurred with Boyles, J.