PUNCHES v. AMERICAN BOX BOARD CO.

1. MASTER AND SERVANT—WORKMEN'S COMPENSATION ACT—FIND-
ING OF BOARD FINAL IF SUPPORTED BY EVIDENCE.
   On certiorari to review an award of compensation by
   the industrial accident board, under the workmen's com-
   pensation act, the finding of the board, if supported by
   any evidence, in the absence of fraud, is final.

2. SAME—ACCIDENTAL DEATH—SCOPE OF EMPLOYMENT.
   Where an employee, who was expected to care for and
   feed the team of horses he was hired to drive, was in
   the habit, with his foreman's knowledge, of driving them
   to his home at night and placing them in his own barn
   the more conveniently to care for them, he was acting
   within the scope of his employment while driving them
   to his employer's place of business to begin the day's
   work, and the industrial accident board properly held
   that his accidental death, while so engaged, was an in-
   dustrial accident entitling his widow to compensation
   under the workmen's compensation act.

Certiorari to Industrial Accident Board. Submitted
October 27, 1921. (Docket No. 33.) Decided De-
cember 21, 1921.

Sylvia Punches presented her claim for compensa-
tion against the American Box Board Company for
the accidental death of her husband in defendant's
employ. From an order awarding compensation, de-
fendant and the Michigan Employers Casualty Com-
pany, insurer, bring certiorari. Affirmed.

*Brown & Kelley*, for appellants,
*Cornelius Hoffius* and *Dorr Kuizema*, for appellee.

STONE, J. In this proceeding the defendants and

On injuries arising out of and in the course of the employment
in general, see notes in L. R. A. 1916A, 40, 232; L. R. A. 1917D,
114, L. R. A. 1918F, 896.

appellants seek to reverse the findings of the industrial accident board that decedent was within the course of his employment at the time of the accident which resulted in his death, and that the accident to decedent arose out of his employment. Plaintiff claims compensation as the only dependent of Jideon Punches, her deceased husband, who, she claims, died at Grand Rapids on September 9, 1920, as the result of an accidental personal injury sustained by him while in the employ of defendant American Box Board Company on September 8, 1920. On arbitration the plaintiff was awarded compensation at the rate of $14 a week for a period of 300 weeks. From this award defendants appealed to the board. Some additional testimony was submitted to the board and the award was affirmed.

The defendant American Box Board Company was engaged in the manufacture of corrugating and fibre shipping containers, at Grand Rapids, Michigan. In its business it had occasion to use a team of horses for the purpose of drawing straw, paper and other articles from place to place in its yards. One William Barry was the owner of a team, and the yard foreman, Arthur T. Barnes (of whose authority to act for said defendant there seems to be no question) engaged Barry to furnish his team to do this work. It was the original arrangement between Barnes and Barry that the latter was to drive his team, but as Barry was suffering from rheumatism Barnes agreed to let some of his men drive the team. Said defendant began using the team in April, 1920. For about three weeks Barry brought his team to defendant's yard mornings and came for it in the evening, but when the weather became warmer, Barry, who was still suffering from rheumatism, desired to let his team remain over night in defendant's yards. Accordingly the team was placed in a shed on the premises at

night, and was fed and cared for by different employees of said defendant, Barry furnishing the feed and hay, and occasionally coming to the plant to see about his team.   At first no particular employee was charged with the duty of driving the team or caring for it, but Barnes, the foreman, appears to have taken some interest in having the team properly cared for. About June 28th the decedent entered the employ of said defendant as a laborer in the yards.   It appears to have become the practice that the employee who first arrived at the yards in the morning would feed the team.   As decedent usually came to work early, and was the only employee who came past the shed where the team was kept, he usually fed the team in the morning.   He was familiar with the handling of horses, and in the course of time came to do most of the driving of the team, and was the most regular in caring for it.   The men began their work at 7 o'clock a. m.   During the summer the shed where the team had been kept was removed, and the owner brought a canvas which was stretched over poles, and the team was for a time kept under this canvas.   Some five or six weeks before his death, decedent began taking the team to his home, about a mile from his place of work, where he had a barn.   Barnes, the foreman, testified that he had no recollection of having given decedent any express authority to take the team to his barn nights, but that he learned of the practice about the time it began and made no objections. There was some testimony to the effect that Barnes had admitted that he expressly consented to decedent's request that he be permitted to keep the team in his barn as a matter of convenience, but this testimony was contradicted by Barnes.   The decedent kept the team in his barn nights for a period of some weeks, fed the horses from feed furnished by Barry (but some of which had been ordered delivered at de-

cedent's place by Barnes), and decedent cared for the horses there, and drove them onto the job in the morning, with knowledge of the foreman, and without any objection from him.

It appears that decedent voluntarily quit the employ of the said defendant, about two weeks before the accident, but on the morning of the day before the accident he returned to work, "at his old job," and drove the team and took it to his home in the evening, at the close of his work. During the time decedent did not work the team was driven by other employees, and was cared for upon the premises of said defendant in substantially the same manner as had been the practice earlier. It would seem that Barnes did not know that decedent had taken the team to his barn on the night before his accident, that no instructions had been given as to the care of the team on September 7th, and that decedent who returned to his old job of driving the team took it to his home at the end of the day, as he had previously done, without consulting the foreman. It appears from the evidence that on the morning of September 8th decedent fed the team at his home, about 5:30 o'clock, and at about 15 minutes of 7, he hitched the horses to the wagon and started towards the place of his employment, About 5 minutes after 7 o'clock the team ran up to said defendant's yards, and upon investigation decedent was found lying near the driveway, along which it was customary for him to drive in going to and from his work. The planks which formed the wagon box, by being placed loosely upon the bolsters, were found strewn along the ground, between the point where decedent was found and the point where the team was stopped. Some of decedent's ribs were broken, and had punctured his lungs, and he died from his injuries on the next day. We think it appears that decedent fell, or was thrown from the

wagon, while on his way to his work, and thus sustained the injuries which caused his death.

It is the claim and theory of plaintiff that it was a part of the duties of decedent to care for this team; that with the approval and consent of said defendant, through its foreman, decedent had taken this team to his home for the purpose of caring for it, and that, when driving the team from the place where it was being kept to the place of work, he was in the employ of said defendant, and that the accident thus sustained by him arose out of and in the course of his employment.

As we understand the claim of defendants, it is that decedent had taken the team to his home, either for his own personal convenience or for the convenience of the owner, and that his relations to the Box Board Company were the same as those of any other employee going to his work, i. e., that his employment did not begin until he reached his place of employment.

That there was competent legal evidence to support the claim of the plaintiff, we quote from the testimony of foreman Barnes, who was called by plaintiff for cross-examination under the statute. Among other things he testified as follows:

"Q. That was his (Punches') business to do that, to feed the team at home there?

"A. Yes, sir.

"Q. And the team was supposed to be fed before it came down in the morning, before he started to work with it?

"A. Yes, sir.

"Q. And he was to look after the harness and keep that in shape, whatever was necessary?

"A. Yes, sir.

"Q. And the wagon?

"A. Nothing to do with the wagon.

"Q. Well, keep it greased, and so forth, I presume?

"A. Yes, sir. * * *

"*Q.* Had Mr. Punches been laid off for a week or so shortly before this accident?

"*A.* I think he was off a week or thereabouts.

"*Q.* And he had just got to work again, did he?

"*A.* Yes, sir.

"*Q.* Had his old job of handling this team?

"*A.* Yes, sir.

"*Q.* And he expected to come to work that morning, the fatal morning of the accident, with his team?

"*A.* Yes, sir.

"*Q.* And, of course, the team was supposed to be fed when they came down to work?

"*A.* Yes, sir.    *    *    *

"*Q.* You looked after that, too, you made the rules and orders as to how the team should be taken care of when the team was left there on the place?

"*A.* Yes, sir.

"*Q.* At first you put them there in the shed?

"*A.* Yes, sir.

"*Q.* Later on he (Punches) was the regular man, was he, on the team?

"*A.* Yes, sir; he was the most regular man.

"*Q.* You picked him out because he was a steady man and because he knew something about teams?

"*A.* Yes, sir.

"*Q.* He had been a teamster, I believe?

"*A.* Yes, sir.

"*Q.* And so you preferred him?

"*A.* Yes, sir.

"*Q.* And he became the regular teamster there with that team?

"*A.* Yes, sir.    *    *    *

"*Q.* After that time, then, he took charge of that team; took them home?

"*A.* Yes, sir; I think thereabouts; somewhere about that time.    *    *    *

"*Q.* Did you give any orders to Dykstra for the delivery of feed to Punches' home?

"*A.* I think he drove down there, the boy did, and threw it off on the ground, the same as was usual. I told him to take it on to the house.    *    *    *

"*Q.* Whom did you give that order to?

"*A.* Mr. Punches, I guess.

"*Q.* To get feed?

"*A.* To get feed; yes, sir.

"*Q.* And to take it up to his house?

"*A.* Yes, sir.    *    *    *

"*Q.* You had, as you testified before, complete charge of the hiring of these horses, did you not?

"*A.* Yes, sir.

"*Q.* When they were needed to be hired?

"*A.* Yes, sir.

"*Q.* And you had complete charge of their disposition, too, what was to be done with them?

"*A.* Yes, sir.

"*Q.* And as to their housing and feeding and all of that?

"*A.* Yes, sir.

"*Q.* The company did not bother about these things, but left it to you?

"*A.* Yes, sir.

"*Q.* So that you had full authority to do that?

"*A.* Yes, sir.    *    *    *

"*Q.* You at least did take enough interest in the team to see that they looked as though they had been fed?

"*A.* Yes, sir; and cleaned up and taken care of, and that is all it was.    *    *    *

"*Q.* You understand that the general proposition—that these things were being done, and if they had not been done, it would have made a difference; you would have noticed it because you watched to see that it was done; is that right?

"*A.* Yes, sir.    *    *    *

"*Q.* Did you ever tell Mr. Punches it is his duty to feed that team before he went to work?

"*A.* Before he went to work?

"*Q.* Yes, did you ever tell him that that was a part of his duty?

"*A.* He knew enough for that without being told.

"*Q.* I understand; but did you ever tell him to feed that team at his house?

"*A.* I don't know as I did in so many words, no sir.    *    *    *

"*Q.* You first said that you were willing that Punches have the team over to his house?

"*A.* I say so now; I was willing, yes, sir."

The decedent was paid 55 cents an hour and he

worked. 10 hours each day on the premises of said defendant.

We quote with approval the following, from the finding of the industrial accident board:

"This is not a case where an employee went out of the scope of his employment to do the work of another, without the knowledge and consent of his employer. The foreman, according to his own testimony, had assumed the responsibility of seeing that this team received the necessary care. He permitted the decedent to drive the team because he was familiar with horses, and permitted him to attend to the team for the same reason. Driving and tending this team was the work decedent was paid for. He had taken the team to his home for the purpose of feeding and caring for it. While bringing the team to work in the morning, after feeding and caring for it, he was accidentally injured.

"It is our opinion that this accident arose out of and in the course of his employment. Authority to do a certain piece of work does not necessarily rest upon express command of the employer. Where an employer, with full knowledge of the circumstances, permits an employee to do part of his work outside of his regular hours, or off the employer's premises, he should not be heard to say that he is not responsible for the work or for accidents that may arise out of the work. The employer, through his foreman, consented to the decedent's practice of taking the team to his home, and caring for it, caused feed to be sent to his home that the team might be cared for there; and in our opinion, the decedent was in the employ of the employer when necessarily caring for the team, and taking it to and from his barn. *McMinn* v. *Brewing Co.*, 202 Mich. 414; *Malone* v. *Railway*, 202 Mich. 136; *Rowe* v. *Leonard Warehouses*, 206 Mich. 493; 1 Honnold's Workmen's Compensation, pp. 350, 352.

"After careful consideration of the entire record in this case, we find:

"1. That the decedent, Jideon Punches, died as the result of an accidental personal injury, arising out of and in the course of his employment, with the respondent, American Box Board Company.

"2. That the applicant, Sylvia Punches, is entitled to receive and recover compensation from the respondents, American Box Board Company, and Michigan Employers Casualty Company, at the rate of $14 a week for a period of 300 weeks from and after September 8, 1920.

"The above being the only material issue in controversy, it follows that the award on arbitration should be affirmed and an order to that effect will be duly entered."

To the point that decedent was doing something useful and helpful to his employer, see cases cited in *Spooner* v. *Detroit Saturday Night Co.*, 187 Mich. 125, 131, 132 (L. R. A. 1916A, 17). We are of opinion that there was evidence to support the findings of fact of the board.

In *Homan* v. *Power Co.*, 200 Mich. 206, 208, speaking for the court, Justice FELLOWS said:

"If the finding of the ultimate facts upon which the award is based finds support in the testimony, it is our duty to accept such finding as final, in the absence of fraud." Citing cases.

This holding has been announced by this court, in similar but varying language, many times. *Ward* v. *Heth Bros.*, 212 Mich. 180, 197.

The order of the board is affirmed, with costs.

STEERE, C. J., and MOORE, WIEST, FELLOWS, CLARK, BIRD, and SHARPE, JJ., concurred.