BAAS *v.* SOCIETY FOR CHRISTIAN INSTRUCTION.

Workmen's Compensation — Schoolteacher — Injury in Traffic
Accident — Proximate Cause.

> Schoolteacher, a neophyte with limited training and experience
> as such, who was en route to school and had with her books and
> papers for use in her school work when injured in a traffic
> accident *held*, not entitled to workmen's compensation by rea-
> son of the fact she did a substantial amount of school work at
> home, an established practice of teachers at the employer's
> school, since her homework did not make her home a second
> place of employment, there being no causal connection between
> the employment and the injury, transportation between the
> school and home not being furnished by the employer (CLS
> 1956, § 412.1).

Black, Kavanagh, and Souris, JJ., dissenting.

Appeal from Workmen's Compensation Appeal
Board. Submitted January 10, 1963. (Calendar
No. 24, Docket No. 49,949.) Decided December 2,
1963.

Rehearing denied February 3, 1964, by an equally
divided court. See dissenting opinion on denial of
application for rehearing filed by Black, J., March
5, 1964, page 655.

Irene Baas presented her claim against the Society
for Christian Instruction, employer, and Auto-Own-
ers Insurance Company, insurer, for compensation
because of injuries sustained in automobile collision
occurring while she was en route to school and trans-
porting books and papers upon which she had been

---

References for Points in Headnote
58 Am Jur, Workmen's Compensation §§ 158, 214 *et seq.*
Schoolteacher as an employee within workmen's compensation acts.
140 ALR 1383.

working.  Award to plaintiff.  Defendants appeal. Reversed.

*Marcus, McCroskey, Finucan & Libner* (*Robert Libner,* of counsel), for plaintiff.

*Cholette, Perkins & Buchanan* (*Edward D. Wells,* of counsel), for defendants.

*Amici curiae* on application for rehearing:

Michigan AFL-CIO by *Rothe, Marston, Mazey, Sachs & O'Connell* (*Bernard M. Freid,* of counsel).

Michigan Federation of Teachers, by *Kelman, Loria, Downing & Craig* (*Roger E. Craig,* of counsel).

KELLY, J.  The sole question presented is:  Did plaintiff's injuries arise out of and in the course of her employment as a schoolteacher?  The hearing referee answered "no."  On appeal, the appeal board answered "yes."

Plaintiff, who lived in Holland, Michigan, was injured when her automobile collided with another as she was driving to her employment as a second grade school teacher at the Cherry school in Zeeland.

The appeal board found that plaintiff was a teacher of limited training and experience and that she did a substantial amount of school work at home, which was in accordance with an established and approved practice of teachers at the employer's school; that on the weekend before her injury she took school books and papers home with her and performed work at home in connection therewith; that at the time of the injury she was traveling from her home to the school and had with her books and papers for use in her school work; that while plaintiff could have remained at the school at the conclusion of the work day the temperature at the school

was lower than usual during the day, after 4:30, janitor services and protection were not available, and the cafeteria was then closed; that plaintiff "was injured as the direct result of a 'special hazard' consisting of the very icy and dangerous highway which she was compelled to travel on her way to school."

Appellants, claiming the appeal board refused to consider the law applicable, call attention to the fact that they cited and relied upon *Murphy* v. *Flint Board of Education*, 314 Mich 226, as being directly in point, but the appeal board wholly ignored and made "no reference or attempt to distinguish the case," and "their silence we submit is significant."

Appellee, answering, states that while *Murphy* v. *Flint Board of Education* is "a scholarly and carefully decided case" and "seemingly opposed to the proposition for which we are contending," yet "on close examination the proofs in *Murphy* do not measure up to the particular facts of the instant case"; that, "Unlike *Murphy, supra,* in the instant case plaintiff was truly a neophyte in the teaching profession. This was her first experience at any type of actual educational instruction. Not having had any practical experience or special instruction in teaching in prior years, plaintiff was duty-bound to make an additional effort to enable her to properly perform her work."

The instant case and *Murphy* v. *Flint Board of Education, supra,* are similar in the following respects: (1) In both cases plaintiffs claimed the proper performance of their duties as a teacher required them to do work at home; (2) Both plaintiffs were injured while journeying between their schools and their homes and both were carrying school books and papers; (3) In both cases the records justify the conclusion that teachers engaged in school work prepare work when necessary outside of the school in which they are employed; (4) Nei-

ther was injured at home because of homework or carrying papers or books, nor was either injured while working on papers or books during travel from school to home, and the hazards of street travel would have been the same if they had completed their work at school; (5) Neither was provided transportation as part of her employment and both could travel from school to their homes in any way they chose.

The *Murphy* opinion says in part (p 229):

"On behalf of plaintiff it is claimed, in substance, that the proper performance of her duties as a teacher required her to do work at home, or at least outside of the school building where she was regularly employed. Plaintiff testified on the hearing before the deputy commissioner that the building in which she worked was regularly locked by the janitor at 4:30 in the afternoon, but that teachers remaining there after that hour could get out of the building prior to 5 o'clock on request to an office employee. Plaintiff claims, however, that had she remained in the building as long as possible she would not have had sufficient time to do the work that she wished to do. The record justifies the conclusion that many teachers engaged in public school work prepare work, when necessary, outside of the school in which they are employed, and the testimony of the principal of plaintiff's school indicates that he expected his teachers, including plaintiff, to be prepared, and to do home work if such was required for proper performance of teaching duties."

We do not agree with appellee that the fact plaintiff was "a neophyte" is sufficient to constitute a legal basis for a distinction between the instant case and the *Murphy Case.*

In *White* v. *Public Service Commission,* 338 Mich 282, 287, we stated:

"The mere inference from the fact that Commissioner White took work home with him would not

establish that his transportation to and from Lansing was incident to and a part of his employment. Nor would it justify the conclusion that the public service commission had another office in Niles, Michigan. See the rule applied in *Murphy* v. *Flint Board of Education,* 314 Mich 226, and *Kelly* v. *Dixie Fuel & Supply Company,* 329 Mich 466."

The school building was plaintiff's place of work, and the fact that she did work at home did not make her home a second place of employment.

We do not agree with appellee that "the *Murphy* holding is distinguishable and should not bar an award in this case." The following from *Murphy* v. *Flint Board of Education, supra,* is applicable to this case (pp 237, 238, 241, 242):

" 'The claim is based entirely upon the theory that while at her home she did some work in preparation for her school duties and that therefore she was in the course of her employment not only while in the school building, but while traveling from the school to her home, and while in her own home, and also while en route back to school. It would follow from an application of that theory that the workmen's compensation fund would become a general insurance fund covering accidental injury or death of such employee, whatever the cause, and wherever and whenever it may have occurred. Payment would thus be required in this case had the injury been caused by a fall, or otherwise, in the decedent's own home.

" 'Let us again apply the test of hazard of employment, and inquire whether the injury was sustained in the course of or arose out of the employment. It is not contended, and cannot be, that the decedent sustained any injury as a result of any risk or hazard of the employment itself, or that the fatal injury was occasioned in the course of or arose out of the employment. It was not caused by any equipment, tools or material in any wise con-

nected with her employment, and the employment had no causal connection with the injury either through its activities, its conditions or its environments. In this respect this case differs essentially from cases cited and relied upon by defendant in error. *If there can be a recovery under the facts in this record, then there could be a like recovery in the case of any clerk, stenographer, bookkeeper, or of any other employee employed in an office, bank, store, factory, or other place of employment, who carried home any books, papers, statements, et cetera, for any purpose at all connected with his duties, and sustained an injury while absent from the place of employment and while engaged in some act not in any wise connected with the duties of the employment. That would disregard entirely the test of the right to such award, which is whether the employment had some causal connection with the injury.'*  (Emphasis supplied.)     *     *     *

"Applying general principles, recognized in the decisions of this court above referred to, and likewise in the cases cited from other States, can it be said on the basis of the testimony in the record that plaintiff's injury arose out of and in the course of her employment? We think not. It is apparent that on the completion of her duties in the school building, which was the regular and ordinary place of her employment, she would have gone to her home as a matter of course and without reference to her intention to do work there in preparation for her further teaching duties. The situation would have been precisely the same, insofar as incurring the hazards of street travel were concerned, if she had fully completed her work before leaving the school. She was not at the time of injury engaged in any specific mission for her employer. The risks incident to street travel did not arise in the course of her employment under her contract; nor was there any

---

* The Court quoted from *Industrial Commission of Ohio* v. *Gintert,* 128 Ohio St 129, 132, 133 (190 NE 400, 92 ALR 1032).—REPORTER.

'causal connection' between the unfortunate injury that she sustained and the work that she was required to do."

The hearing referee was right in refusing an award. The workmen's compensation appeal board was wrong in granting the award and, therefore, we reverse the award of the workmen's compensation appeal board and reinstate the award of the hearing referee. Costs to appellants.

Carr, C. J., and Dethmers, J., concurred with Kelly, J.

Black, J. (*dissenting*). The distinctive facts of this case present anew the most recurrent of all questions arising under the workmen's compensation law. Did plaintiff's injury and resultant disablement arise "out of and in the course of" the scope of her employment? The appeal board, relying particularly on the early case of *Punches* v. *American Box Board Co.* (1921), 216 Mich 342, answered in the affirmative. Some of my Brethren, relying upon the much more recent case of *Murphy* v. *Flint Board of Education* (1946), 314 Mich 226,[1] answer in the negative and consequently vote to reverse the board's award to plaintiff. I in turn stand for affirmance, giving reasons introduced by the conclusion of that which was written in the *Punches Case* (p 350):

"To the point that decedent was doing something useful and helpful to his employer, see cases cited in *Spooner* v. *Detroit Saturday Night Co.*, 187 Mich 125, 131, 132 (LRA1916A, 17, 9 NCCA 647). We are of opinion that there was evidence to support the findings of fact of the board.

"In *Homan* v. *Boardman Power Co.*, 200 Mich 206, 208, speaking for the court, Justice Fellows said:

[1] Note how *Murphy* completely ignores *Punches*. More of *Punches* seems to be in order.

" 'If the finding of the ultimate facts upon which the award is based finds support in the testimony, it is our duty to accept such finding as final, in the absence of fraud.' Citing cases.

"This holding has been announced by this Court, in similar but varying language, many times. *Ward* v. *Heth Bros.,* 212 Mich 180, 197."

The aforesaid phrasing of section 1 of part 2 of the statute having stood without change since the orignial enactment of 1912 (see CL 1915, § 5431; CL 1929, § 8417; CL 1948 and CLS 1956, § 412.1 [Stat Ann, Stat Ann 1950 Rev, Stat Ann 1960 Rev § 17.151]), it would seem that specially careful scrutiny of our earlier decisions, wherein such phrasing was interpreted and applied in factually similar circumstances, should lead to much greater accuracy of interpretive application of section 1 to the present facts as found. In truth we endeavor now to ascertain, from words employed by the legislature and by this Court more than 40 years ago, what the legislature of that generation intended should be done with a case of factual specifics shown as at bar.

"Presumably, they [the members of the Court seated at the time] knew more about the background and intended scope of the pivotal phrase—'arising out of and in the course of his employment'—, found in original and present section 1 of part 2 of the workmen's compensation act, than we do." (*Dyer* v. *Sears, Roebuck & Co.,* 350 Mich 92, 95.)

The Justices seated during the second and third decades of this century "were there" indeed. Two of them, one after the other, were attorneys general of Michigan during the years of debate, enactment, and working in of Michigan's workmen's compensation law. All then members of the Court knew well the laws and decisions of Great Britain and of this country, which then were presumably adopted by

the legislature when that body voted into the act the English wording which appears in said section 1. These great jurists, notably Justices FELLOWS, STEERE, and BIRD, tell us today, through the cases presently quoted and cited, the principles this Court should apply upon approach to and consideration of these "going and coming from work" cases; principles which seem to have endured unto national acceptance[2] (if not recent acceptance in our quarters).

Larson, having declared the general rule that injuries sustained by employees when going to and from their regular place of work are not deemed to arise out of and in the course of employment, goes on to consider the exceptions; the exceptions which indubitably have made the administrative and judicial tasks more difficult. Under the heading "Dual-purpose rule as applicable to going and coming" (1 Larson's Workmen's Compensation Law, § 18.21,

---

[2] "The general rule is that injuries sustained by employees when going to or returning from their regular place of work are not deemed to arise out of and in the course of their employment. Ordinarily the hazards they encounter in such journeys are not incident to the employer's business. But this general rule is subject to exceptions which depend upon the nature and circumstances of the particular employment. 'No exact formula can be laid down which will automatically solve every case' [citing cases]. While service on regular hours at a stated place generally begins at that place, there is always room for agreement by which the service may be taken to begin earlier or elsewhere." *Voehl* v. *Indemnity Insurance Company of North America*, 288 US 162, 169 (53 S Ct 380, 77 L ed 676, 87 ALR 245).

And see *American Mercury Insurance Company* v. *Britton*, 114 App DC 280 (314 F2d 285, 286), applying and following *Voehl's* rule:

"While the general rule is that injuries occurring to employees traveling to and from their regular place of work are not deemed to arise out of and in the course of their employment, the instant case constitutes an exception in that here there was a consistent and recognized practice that some of deceased's services to the company were carried on in his room, and such being true, the commissioner was justified in finding the injury to have arisen out of and in the course of the deceased's employment. *Voehl* v. *Indemnity Insurance Co.* (1933), 288 US 162 (53 S Ct 380, 77 L ed 676, 87 ALR 245). We are unable to find a distinction of substance between the instant case and that of *Proctor* v. *Hoage* (1935), 65 App DC 153 (81 F2d 555). Whether the agreement to do work at home is express or implied by the course of business should make no difference in the result."

p 247), the author states helpfully our immediate question:

"The question then becomes: was the business mission of such character or importance that it would have necessitated a trip by someone if this employee had not been able to handle it in combination with his homeward journey?"

The appeal board answered "yes" to this question, expressly (see quotation below). Now I do not say that the board was compelled to draw inference and make answer as it did. I simply say that the board upon the proof was legally entitled to thus infer and answer. And if the board was so entitled, our reviewable function arrives inexorably at affirmance.

The authorities will come later, but first we should examine the facts, sifted for *any* evidence legally supportive of the appeal board's conclusion.[3] Accordingly, and in comparably convenient juxtaposition, I array the 2 sets of summarized findings found in the Baas and *Murphy* Cases:

---

[3] For the applicable appellate rule, see *Meyers* (*Meyers* v. *Michigan Central R. Co.*, 199 Mich 134) and reaffirmation thereof in *Thornton* (*Thornton* v. *Luria-Dumes Co-Venture*, 347 Mich 160, 162).

Baas Case
(Opinion of Appeal
Board)

"Plaintiff at the time of injury was transporting books, test papers and formulated plans to school for use in school. The test papers were necessary to grade the students. The plans were necessary for the work of the day and coming week. Her plan book actually managed to reach the school and was 'nice for the assistant teacher that had to step in.' If the school had sent a messenger to get these papers as it might have, there would be no question raised about his being in the course of his employment. It is no different here."

*Murphy Case*
(Opinion of Court,
per Carr, J.)

"In the case at bar plaintiff, at the time she received her injury, was not engaged in performing any specific duty for defendant, at defendant's direction or request. It was not incumbent on her to go directly to her rooming place if she had occasion or desire to go elsewhere. She was not charged with the duty of transporting or safeguarding property of the employer. It should be noted, also, that the accident happened on Monday; that the examinations, for which plaintiff wished to prepare questions, did not begin until the following week, and there is no showing in the record that the preparation of such questions on the day of the injury was necessary." (p 234.)

We are told regularly—in fact were told in the *Murphy Case* at 230—that the proper determination of these out-of-and-in-course-of cases "rests on the particular facts and circumstances disclosed by the record." Bearing that in mind, conjunctively with our aforesaid "any evidence" rule, let us review what is said to call for a matter-of-law holding that Mrs. Baas was not, at the time of injury, engaged in carrying out any mission for her employer.

Mrs. Baas' homework—done that weekend—was imminently necessary to the proper conduct of school and performance of her teaching duties. When she started from home and proceeded toward the school, she had with her, not only the completed examination work done over the weekend, but also the home-prepared "lesson plan" for that school day which (regardless of where it was prepared) had to be ready when the morning bell tolled. She also carried her home-prepared "master 2-week plan," according to prescribed duty. The day's "lesson plan" was ready for the "ditto machine" and distribution to each pupil, and the class work was regularly conducted according to such plans.

That such work was done and ready, for use of the hurriedly summoned substitute teacher, is a fact which stands out from this record. That Mrs. Baas had done—at home—something "useful and helpful to [her] employer" can hardly be gainsaid. That the employer knew the practice—of precedent home preparation of such work—is conceded. And that Mrs. Baas thereby, directly as well as indirectly, did something which furthered her employer's business, is something more than a fair conclusion upon this record. Is there, all this viewed fairly, *no* evidence that Mrs. Baas' injury arose out of and in the course of her employment? See authorities quoted at conclusion of this opinion.

If a schoolteacher's work, taken home for necessary preparation and readiness for the next ensuing school day, is to be pronounced less beneficial to her employer than is the taking home by a teamster-employee of the employer's team for feeding, care and rest for the next day's work (*Punches, supra*), then I protest such dixit for want of supportive reasons. If the taking home by a store manager of his employer's cash ($332) for safekeeping overnight and return to the store the next morning

(*Clifton* v. *Kroger Grocery & Baking Co.,* 217 Mich 462), amounts legally to greater service to the employer than what Mrs. Baas carried home, for aforesaid work and readiness for the next school day, then I suggest that the taking home and safekeeping of cash overnight has somehow become more valuable to one's employer than the doing of indispensably requisite educational work at home. Further, and if *Murphy* is supposed to constitute an overruling, of *Punches* to any extent, then I reject such thought for want of evidence of intent to overrule *Punches* when *Murphy* was written (*Punches* was not even mentioned at the time). And if it is to be said that the legislature has "acquiesced" in *Murphy's* rather obvious garroting of said section 1, then I must observe that the legislature has likewise "acquiesced," for 40 years plus, in *Punches'* application of said section 1. Finally, and if *Murphy* is supposed to be at variance with *Punches* and all of the presently quoted espousals thereof, then I suggest that *Murphy* should be overruled in favor of such earlier and—in my view—much more enlightened decisions of this Court. That, by the way, we have done on several occasions when previous section 1 cases were before us, notably as in *Sheppard* v. *Michigan National Bank,* 348 Mich 577, and *Dyer* v. *Sears, Roebuck & Co., supra.* I see no reason, frankly, why school teachers should be treated differently, in the application of said section 1, than are teamsters, store managers, automobile salesmen, and traveling salesmen (see present quotations), provided of course the essential facts found in their cases disclose that each "was doing something helpful to his employer" while going home from work and then returning to work.

The line of cases just mentioned were written into our reports by the so-called FELLOWS Court, between 1922 and 1924. All were unanimous. All recognize

the *Punches Case.* I quote them in succession as follows:

"We think defendants beg the question in the assertion that carrying the money home was a mere incident of plaintiff's trip at which time his employer had no control over him but he was left free to go where he pleased, even to 'have dined down town and then gone to the theater,' that had he done so and "fallen down the theater stairs' he could with like force claim he violated no duty and 'but for the money he would have taken another stairway.' So far as the duties of his employment are concerned, it can as well be said that his going towards home was an incident of the performance of his unfinished daily duties. In *Punches* v. *American Box Board Co.,* 216 Mich 342, the injured party was at the same time returning to work from his home and as a duty of his employment was taking a team of horses back to the factory for his employer. *Vide,* also, *Beaudry* v. *Watkins,* 191 Mich 445 (LRA 1916F, 576); *Kunze* v. *Detroit Shade Tree Co.,* 192 Mich 435 (LRA 1917A, 252)." *Clifton* v. *Kroger Grocery & Baking Co.,* 217 Mich 462, 468.

"Similar in principle is the recent case of *Punches* v. *American Box Board Co.,* 216 Mich 342. There the employee as a part of his duties to his employer cared for a team, taking it home at night and bringing it back in the morning. While in the discharge of such duty of bringing the team back in the morning he received a fatal injury. It was held that the accident occurred when decedent was acting within the scope of his employment." *Lipinski* v. *Sutton Sales Co.,* 220 Mich 647, 651.

"In *Punches* v. *American Box Board Co.,* 216 Mich 342, the workman at his home took care of the team used by his employer. While bringing the team to the employer's place of business in the morning he apparently lost control of the horses and they ran away and he was killed. It was held that the accident arose out of and in the course of the employ-

ment. In *Clifton* v. *Kroger Grocery & Baking Co.*, 217 Mich 462, the employee was required by the employer to take to his home the money collected at the store and safely keep it at his home. He was injured while on his way home, carrying with him a considerable amount of money. It was held that the accident arose out of and in the course of the employment, and it was there said (p 464) by Justice STEERE, speaking for the Court:

" 'Broadly defined, it may be taken as authoritatively settled that "out of and in the course of his employment" covers those accidents which befall an employee while he is discharging some duty he is authorized or directed to perform for the furtherance, directly or indirectly, of his employer's business.' " *Derleth* v. *Roach & Seeber Co.*, 227 Mich 258, 261, 262 (36 ALR 472).

These quotations prompt, not a roguish but a fair question. If this section 1 Baas case had been submitted before the FELLOWS Court, would any member of that Court have voted to reverse? Conscious of the only honest answer, I submit that there remains but 1 issue; whether our present membership shall or shall not accept the guide of an early series of unanimous and never challenged decisions of this Court, in each of which a long standing and yet standing statutory phrase was construed and applied to a like "dual-purpose" case, and in each of which the Court referred back for guidance to the first of the series (*Punches* aforesaid).

*To conclude*: Here it cannot be said, as the Court was able to say in *Murphy*, that the plaintiff teacher "was not engaged in performing any specific duty for defendant, at defendant's direction or request." Nor can it be said that she was "not charged with the duty of transporting or safeguarding property of the employer." It can and should be said, as in *Morse* v. *Port Huron & D. R. Co.*, 251 Mich 309 (quoted in *Murphy* at 235), that the testimonially disclosed fact.

of work taken home and done at home, without which school could not have proceeded as it should and did proceed that Monday, all such having been done with the knowledge and approval of plaintiff's employer, fairly justified the board's determination that plaintiff was carrying out "a prescribed duty" when she was injured.

More and more prevalent as time goes on, it becomes judicially noticeable that faithful employees are required, in order to keep abreast of ever more pressing work, to make home a regular and secondary place of performance of such work. This employer having had due notice thereof, and having not only approved but having expected that plaintiff would do at home such essential work, it seems to me that the rule which was written 40-odd years ago by the then industrial accident board, into the *Punches Case* record with declared approval of this Court, is brought to present decisive play. The rule (*Punches* at 349):

"Where an employer, with full knowledge of the circumstances, permits an employee to do part of his work outside of his regular hours, or off the employer's premises, he should not be heard to say that he is not responsible for the work or for accidents that may arise out of the work."

I would affirm, with costs to appellee.

KAVANAGH and SOURIS, JJ., concurred with BLACK, J.

SUPPLEMENTAL OPINION BY BLACK, J. (*dissenting*). The foregoing opinion for affirmance was submitted to other members of the Court on September 13th. Since then Justices O'HARA and SMITH, unwilling as I gather to join Justice KELLY in contribution of that last full measure of devotion to the *Murphy*

*Case (Murphy v. Flint Board of Education, 314 Mich 226)*, have submitted their separate reasons for holding that the plaintiff school teacher is not entitled to compensation per the award below.

This most recent opinion for reversal invites what is due even though there be no invitation, that is, a rejoinder by one who actually has stopped to familiarize himself with the facts, the facts which supposedly make the law. The ensuing supplemental opinion is accordingly turned in for recording in our books; also for better days of better precedent in this State of the fair peninsulas and of unbelievably erratic compensation case law. Purposely tautological, it will return regularly to controlling evidence the award-reversing Brethren have not— judging by chirography to date—sifted and considered as yet.

*First:* Justices O'HARA and SMITH, having plucked a short sentence from the center of that discourse which was approved and adopted in the *Punches Case*,[4] say *"There* is the 'key finding.'" I suggest instead that the continuant contexture of *Punches* leads best to such "key finding" (a finding which proceeds directly opposite to the heading my Brothers steer by their special juristic compass). Recounted, then, for the convenience of those who must read and then estimate anew the legal future of section 1, is *Punches'* unbroken and pertinent text (p 349):

"This is not a case where an employee went out of the scope of his employment to do the work of another, without the knowledge and consent of his employer. The foreman, according to his own testimony, had assumed the responsibility of seeing that this team received the necessary care. He permitted the decedent to drive the team because he was familiar with horses, and permitted him to attend to

---

[4] *Punches v. American Box Board Co.,* 216 Mich 342.

the team for the same reason. Driving and tending this team was the work decedent was paid for. He had taken the team to his home for the purpose of feeding and caring for it. While bringing the team to work in the morning, after feeding and caring for it, he was accidently injured.

"It is our opinion that this accident arose out of and in the course of his employment. Authority to do a certain piece of work does not necessarily rest upon express command of the employer. Where an employer, with full knowledge of the circumstances, permits an employee to do part of his work outside of his regular hours, or off the employer's premises, he should not be heard to say that he is not responsible for the work or for accidents that may arise out of the work. The employer, through his foreman, consented to the decedent's practice of taking the team to his home, and caring for it, caused feed to be sent to his home that the team might be cared for there, and in our opinion, the decedent was in the employ of the employer when necessarily caring for the team, and taking it to and from his barn (citing cases)."

Now I make bold to paraphrase and metaphrase the *Punches Case.*

This is not a case where Mrs. Baas went out of the scope of her employment to do the work of another, without the knowledge and consent of her employer. The principal of the school, according to her own testimony, had assumed the responsibility for seeing that the task of teaching the second grade, by Mrs. Baas, was done properly and according to her direction. She and the superintendent permitted, nay approved, the taking home by Mrs. Baas of the papers and books which had to be worked upon in preparation for the next school day, also for the week ahead, just as the employer's team had to be cared for by Jideon Punches lest that team be not ready for the next day's "on the job" work. Teach-

ing the second grade, *and preparing to teach the second grade that next school day and that next week,* was the work Mrs. Baas was paid to do. She could not do the one, at school, without first having done her required preparatory work at home. That *actually completed preparatory work,* unlike the undone work teacher Edna Murphy started to take home (but did not get there) on the day of her misfortune, had to be done at home and had to be ready when the second-graders were called to attention the next school morning. Why? Because the grade was taught by "ditto" sheets the teacher had to master-prepare, ahead of time for such next day. And why did that master-preparation have to be done at the teacher's home? Because no other place was provided for the doing thereof, and because the employer approved its being done at the teacher's home.

Not that it was necessary, to establish the "in" and "out of" character of Mrs. Baas' trip, that she transport or attempt to transport those "ditto" sheets only to school. The separate "lesson plans," also prepared by her at home for the next 2 weeks, also had to be gotten to school by her; or by "someone sometime." Such fact alone was sufficient to provide the essential "concurrent cause of the trip" Mrs. Baas started that morning. More of this later, as *Marks' Dependents* v. *Gray,* 251 NY 90 (167 NE 181) comes to scrutiny and application.

I said—above—that the work taken home by Mrs. Baas was imminently required for the next school day; whereas such was not the fact of *Murphy.* Now hear Justice Carr, writing in *Murphy* at 234:

"She [Edna Murphy] was not charged with the duty of transporting or safeguarding property of the employer. It should be noted, also, that the accident happened on Monday; that the examinations,

for which plaintiff wished to prepare questions, *did not begin until the following week, and there is no showing in the record that the preparation of such questions on the day of injury was necessary.*[5]

This is not all for the dubious case of *Murphy,* as we shall see anon.

To the contrary of *Murphy,* there is in this case of Baas an undisputed "showing in the record" that the precedent preparation of the master-dittos was necessary to the teaching of the second grade, the very next school day. Thus Justice CARR, for all who will not avert judicial gaze as they read what was written by him in *Murphy,* has with then signatory Justices distinguished the *Murphy Case* from the one now before us.

Now, lest there be attempted squirming from this "key" fact, let us read quite undisputed testimony dealing with Mrs. Baas' duties and her faithful execution thereof up to the point of collision that icy and wintry morning. Miss De Roo, principal of the Zeeland school where Mrs. Baas taught, is testifying:

"*Q.* Were any books returned to you?

"*A.* A man brought her briefcase and planning book, and her plan book was for the next 2 weeks. That was so nice for the assistant teacher that had to step in.

"*Q.* Mr. Mulder testified it was up to her to draw those plans, is that right?

"*A.* She would come to me sometimes because I taught second grade too, so sometimes we planned it together.

"*Q.* This work was done at home?

"*A.* This work was done at home because she had her reading book and spelling book, and we would get a whole empty book and have to fill in what we have to do every day and every subject. That has

---

[5] Emphasis supplied by the present writer.

to be at least a week in advance so if anything should happen if we be sick or something, the substitute teacher can step in and go on with what Bible story, or what arithmetic we are working on, or spelling."

Now we listen to Mr. Mulder, superintendent of the school system:

"*Q.* It is part and parcel of the professional practice of teachers to do part of their work at home, particularly the teachers assigned to your school; is that correct?

"*A.* Yes, and the reason—getting back to this other idea of doing it in school—teachers would have no social life at all if they didn't do it that way. They might go out to a basketball game and have to do it after the basketball game. Otherwise, she would be tied to a desk all of her time. Maybe that is why people think teachers are queer.

"*Q.* They would be required to transport in these briefcases, papers and books; is that right?

"*A.* I would say that would be commonplace.

"*Q.* You couldn't prepare assignments if you did not have the books?

"*A.* Lesson plans.

"*Q.* Anything else that had to be transported back and forth?

"*A.* Particularly in the case of Mrs. Baas, she would have no plans, so she would have to prepare all her plans, and she would have to do all of her planning when she was not in school. If you can picture a teacher sitting at a desk where the pupils were and doing her planning—

"*Q.* This would require some physical properties —books and papers?

"*A.* Very definitely."

Finally, Mrs. Baas' husband testified as follows:

"*Q.* We are interested in knowing from you what work Irene regularly brought home, how many hours she worked regularly on her work assignment and

what she particularly did the weekend prior to this injury.

"*A.* Well, the routine at our house was we would eat supper around 6 o'clock or 6:30, and immediately after supper cleared the table. I would do the dishes and she would do her homework—approximately 7 or 7:30. She would usually work until 11 o'clock, or possible longer.

"*Q.* Describe her homework. Were there merely papers, or papers and books?

"*A.* There were papers and books. Mostly papers. She would first usually correct papers. This was the project she had done during the day. Also she had to prepare the lesson for the class the next day. She made dittos—she had a type of paper she would draw the lesson plans on and the next morning the first thing she would run off the ditto machine and have a copy for each pupil. Her master 2-week plan was usually done every weekend. She would plan at least a week ahead each weekend."

So far, my Brethren in majority do not advise why they have ignored—or must ignore—all this evidence. True, they may not believe any of it. But if that is the reason, such reason should be stated of record, rather than given the silent treatment. All members of this Court are entitled to know why evidence and inference of apparently decisive value are majority-disdained here. So is this permanently disabled schoolteacher and her family.

To rule peremptorily that sworn and administratively found facts disclose—as a matter of law—no right to that which the statutory administrator has awarded or denied, and to make such ruling without deign of reason for disregard of such facts, is no less than that kind of judicial otiosity which, sooner or later if not uncovered, is due to make sluggards of us all. I prefer a clangorous arousal, hopeful that it will provoke some explanatory precedent of factual as well as legal value upon which the appeal

board, to say nothing of an already vexed profession, may rely with some degree of assurance.

One would naturally conclude, upon uncritical perusal of the 2 current opinions for reversal, that the presently assigned task of this Court is that of finding *any* evidence—*any* permissible inference— upon which to base a denial of compensation. The task happens to be the other way around where, as here, the board has awarded compensation and the employer has sued out certiorari under long- standing section 12 of part 3 of the act (CL 1915, § 5465, CL 1929, § 8451, CL 1948, § 413.12 [Stat Ann, Stat Ann 1950 Rev, Stat Ann 1960 Rev § 17.186]). To the fully sharpened point, see FELLOWS, J., writ- ing for the unanimous Court in *Meyers* v. *Michigan Central R. Co.,* 199 Mich 134; and quotation of *Meyers* with unreserving approval in *Thornton* v. *Luria-Dumes Co-Venture,* 347 Mich 160, 162. If this were not so, some great Nestor of our bench would—long since—have told us.

*Second:* Justices O'HARA and SMITH quote *Mur- phy* (at 229) as relevantly informing us that "No claim is made that the fact that she was carrying the books and papers referred to contributed in any way to the injury she suffered." This brings us to the reliance of Justices O'HARA and SMITH upon an- other selected sentence taken from the landmarked and much misunderstood[6] case of *Marks' Dependents* v. *Gray,* 251 NY 90, 93 (167 NE 181).

The court in *Marks* laid down a hitherto uni- versally accepted test. Justice Cardozo, having con- sidered the testimonial record at hand, concluded by such test that the death of Mr. Marks was non- compensable because he was killed on the highway while on a purely personal trip, that is, "He was

---

[6] See the "when rightly understood and applied" quotation from Larson, in the *Brown* v. *Arapahoe Case, post* p 647.

making it in fulfillment of a promise to call for his wife at the end of the day, and bring her home in the family car." Now, with the Cardozo test in constant mind, I consider Michigan's "twofold purpose" rule; a rule which, as we shall perceive by quotation, fits such test perfectly.

Two factors, one definitely personal and the other just as precisely the doing of "something useful and helpful to her employer" (the quote again is from *Punches*), establish that Mrs. Baas was "engaged in a twofold purpose."[7] That "twofold purpose" was the personal-benefit trip to work from home, and the bringing to work with her of that work-product which had been, yes, manufactured at home for the job to be done, that day and ensuing days, at the regular place of work. Indeed, the ditto sheets and lesson plans done at home, which Mrs. Baas was endeavoring to transport to school, made it possible for the hurriedly summoned substitute teacher

---

[7] This quotation is from the pen of Justice CARR, writing for himself and 3 others in *Wheeler* v. *Conservation Dept.*, 350 Mich 590, at 595. There Justice CARR and the other 3 agreed with 4 more Justices that, because Wheeler "was promoting also a private purpose" did not alter the right of Wheeler's dependents to compensation in that section 1 case. Justice CARR, (supported by present Justices DETHMERS and KELLY) wrote as follows:

"The situation presented fairly comes within the rule recognized in *Anderson* v. *Kroger Grocery & Baking Company*, 326 Mich 429. There defendant's employee, as found by the workmen's compensation commission, was, at the time of the accident in which he was injured, engaged in a twofold purpose. The testimony indicated that his mission involved not only a private purpose but also the performance of an act within the scope of his employment. The conclusion is warranted that a like situation existed in the case now before us, thus justifying the conclusion of the appeal board that the electrocution of Mr. Wheeler arose out of and in the course of his employment. Under the rule in the *Anderson Case* the fact that he was promoting also a private purpose did not alter the situation.

"The statute (CL 1948, § 413.12 [Stat Ann 1950 Rev § 17.186]) provides that the findings of fact made by the compensation commission (now the appeal board), acting within the scope of its powers, 'shall, in the absence of fraud, be conclusive.' There being testimony to support the finding made, this Court may not on appeal change the result. *Shaw* v. *General Motors Corporation*, 320 Mich 338; *Hooks* v. *Wayne County Road Commissioners*, 345 Mich 384."

to carry directly on, as Mrs. Baas would have done but for her accident while on the way.

My Brothers declare, from *Marks' Dependents* v. *Gray,* that "What concerns us here is whether the risks of travel are also risks of employment." I fully agree and note immediately that the appeal board, similarly concerned, answered affirmatively by pointing to the messenger test. "Someone" (see ensuing quotation of Larson) had to bring the sheets and lesson plans to school from the Baas home, and the transportation thereof was due that morning. The sheets and plans did get to school, partly through Mrs. Baas' effort and partly through the effort of a volunteer, the latter probably having been 1 of the police officers who picked up, from the pavement, Mrs. Baas' strewed about books and papers. As the appeal board pointed out, if the second transporter had been an employee of the school, and had been sent to the scene of accident to get the books and papers, he would—traveling each way on the trip—have been engaged in the course of his employment and, if disabled on the way, would have qualified for compensation. Nevertheless, say my Brothers, Mrs. Baas is to be judged —yes, as a matter of law—as having been outside the legal ambit that morning.

Grotesque law? Yes, bred and inbred only in Michigan; the State which, according to Roscoe Pound, "has attained a bad eminence in narrow interpretation and application of the workmen's compensation act." (For full quotation and source, see *Mack* v. *Reo Motors, Inc.,* 345 Mich 268, at 281.)

Since *Marks' Dependents* v. *Gray* is advanced as authority for overruling the appeal board, I would examine its rightful scope with Larson, concededly a national authority on workmen's compensation (1 Larson at 244):

"It is inaccurate and misleading to call this test, as sometimes has been done, the 'dominant purpose' test, or to paraphrase it by saying that the trip is a business trip if the 'primary' purpose is business. Judge Cardozo used no such language. He said it was sufficient if the business motive was a concurrent cause of the trip. He then defined 'concurrent cause' by saying that it meant a cause which would have occasioned the making of the trip even if the private mission had been canceled. One detail must be stressed to make this rule complete: it is not necessary, under this formula, that, on failure of the personal motive, the business trip would have been taken *by this particular employee at this particular time.* It is enough that someone sometime would have had to take the trip to carry out the business mission. Perhaps another employee would have done it; perhaps another time would have been chosen; but if the trip would ultimately have had to be made, and if the employer got this necessary item of travel accomplished by combining it with this employee's personal trip, it is accurate to say that it was a concurrent cause of the trip, rather than an incidental appendage or afterthought."[8]    (Italics by Larson.)

Yes, "It is enough that someone sometime would have had to take the trip [the trip Mrs. Baas started that morning] to carry out the business mission." I repeat then, for due stress, that the lesson of the day, ready for "dittoing," had to be transported from Mrs. Baas' home to the school, and that "someone" had to get it the rest of the way when Mrs. Baas' "twofold" trip was interrupted by her accident; an

---

[8] Recently, in the strikingly like case of *Brown* v. *Arapahoe Drilling Co.*, 70 NM 99, 102 (370 P2d 816, 818, 819), the supreme court of New Mexico observed, immediately after quotation of the *Marks-Gray* test:

"The above test, as said in 1 Larson's Workmen's Compensation Law, at p 241, is 'a formula which, *when rightly understood and applied,* has never yet been improved upon.'"    (Italics by New Mexico court.)

accident which, regrettably, seems to have put her out of all kinds of gainful employment for the rest of her life; not just 500 weeks.

The appeal board, boresighting the target made by Cardozo and Larson, saw this transportational fact clearly and applied it rightfully to the concurrent causes of Mrs. Baas' trip. The trip was dually purposed and, just on account of its duality, may well have brought her to the immediate seconds of collisive danger on time for accident and injury that icy morning, rather than earlier or later for safety. By Cardozo's test, her work created an additional "necessity for travel" from home to school.

"The test in brief is this: If the work of the employee creates the necessity for travel, he is in the course of his employment, though he is serving at the same time some purpose of his own. *Clawson* v. *Pierce-Arrow Motor Car Co.*, 231 NY 273 (131 NE 914)." *Marks' Dependents* v. *Gray* at 93, 94.

Cardozo's test has become the standard text of 58 Am Jur, Workmen's Compensation, § 241, pp 744, 745, "Effect of Mingling of Purposes of Employer and Employee." The text:

"The test ordinarily employed for determining liability in such a case is that, if the work of the employee creates the necessity for travel, he is in the course of his employment though he is serving at the same time some purpose of his own."

*Third:* Justices O'HARA and SMITH conclude that "Her accidental injury arose out of automobile travel, not out of the work she was required to do at home." That flat declaration is put forth as a matter of law. There is no qualification. Thus it must be, likewise as a matter of law, that when any employee gets into a motor propelled vehicle, and then drives it out on a public way, an injury sustained by him during the course of such highway

travel arises exclusively out of such motor travel, no matter the nature of the employee's mission.

Such reasoning spurns the automobile-traveling salesman's case of *Derleth,* quoted in my first opinion. It snubs too the motorcycling employee's case of *Kingsley* v. *Donovan,* 169 App Div 828 (155 NYS 801), upon which the Court in *Derleth* relied along with *Punches* and other like section 1 cases. It ignores (here is the real sin) the "twofold purpose" rule, a rule which is neither new nor novel. See 1 Larson,. beginning under heading "Dual Purpose Trips" at page 240 (§ 18.10 *et seq.*). The rule seems to have come first—in Michigan—to unanimous and unequivocal approval in the *Clifton Case (Clifton* v. *Kroger Grocery & Baking Co.,* 217 Mich 462) at 465. Later in *Anderson* v. *Kroger Grocery & Baking Co.* 326 Mich 429, the Court said (p 433) :

"The commission found that decedent had a two-fold purpose in going to the restaurant, one to have breakfast and the other to do business for his employer, in accordance with the well-established custom acquiesced in by the employer; that the causes were concurrent and so closely related that it would be impossible to conclude that either one was the primary reason for his absence from the store. As the business aspect was found not to be merely incidental, it follows that the injury arose out of and in the course of the employment, and is compensable. The requisite causal connection was present."

Note, in the *Anderson Case,* the Court's refusal upon stated reason to apply the *Murphy Case.* Is not *Murphy* presently inapplicable for the same reason as was given for inapplicability thereof to *Anderson?* Here is *Anderson's* cohibitor of *Murphy* (p 434) :

"Defendants cite *Murphy* v. *Flint Board of Education, supra, Jeffries* v. *Jodawelky,* 304 Mich 421, *Conklin* v. *Industrial Transport, Inc.,* 312 Mich 250,

and *Haggar* v. *Tanis,* 320 Mich 295, in support of their claim that the injury was outside the ambit of employment. The facts of those cases distinguish them from the instant one. In the *Murphy Case* the injury occurred after the working day, while claimant was on the way home. She was not at the time engaged in any specific mission for her employer."

Now will someone rise here and say what all reversers are so far chary of saying; that is, that Mrs. Baas was not at the time "engaged in any specific mission for her employer"? Failing that, are we not plunged ever deeper into that "wilderness of doubt and confusion" former Justice Talbot Smith wrote of in the section 1 case of *Sheppard* v. *Michigan National Bank,* 348 Mich 577, at 601?

The *Sheppard Case,* all 58 pages of it, was written in 1957. Now, with the handing down in 1963 of this similarly divided case, have we not cast section 1 again into that nebulous world of demi-law we know too well? All one can answer now is that better precedent surely must be ahead, as our personnel continues inevitably to change and change again.

*Fourth:* Justices O'Hara and Smith look upon my first opinion as "erroneously" making, of Jideon Punches' driving of the team as he rode to work, as "synonymous with driving the automobile here." Well, my error—if it be an error—stands confessed, patent and proclaimed. The 2 acts of driving are indeed legally synonymous, as much as if Mrs. Baas had taken a horse (belonging to the school district) home for feeding and care and then had hitched the horse to a borrowed or rented gig or cutter for return of herself with books and papers to school. Both drivers were taking to work something they had readied for the day's work, by work done at home; something the employer needed to have brought in for the regular day's work. Whether drawn by horse or motor both were engaged in a "twofold

purpose," and both upon vehicular injury—while on the way—became entitled to compensation for injury suffered in the course and out of such dual purpose.

*Fifth:* The clincher launched by Justices O'HARA and SMITH is this: "Plaintiff was not required by her employer to drive or travel by car." It is not unfair to retort that neither was Jideon Punches required by his employer to ride—I said "ride"— in Mr. Barry's wagon.[9] He should, by the quartering hairsplit my Brothers make, have driven the team each way from the safety of shanks' mare.

Looking with care at such hairsplit, it should be stressed that it was no part of Jideon's duty to take the wagon (distinguished from the team) home; also that he would not have been hurt had he not been riding in the wagon when the team ran away. It was Jideon's employer-understood duty to take the team home, for care and shelter there, and to return it the next day. The wagon, on the other hand, was taken home by Jideon for his own convenience, that of riding instead of driving the team afoot. So, if we are to say that Mrs. Baas' injury arose exclusively from automobile travel, as Justices O'HARA and SMITH do by their naked *dixi,* then we should say forthrightly that the FELLOWS Court missed wholly this legal jewel my Brothers have unearthed.

If Justices O'HARA and SMITH are right, should not the Court—in *Punches*—have said just as flatly that Jideon's fatal injuries arose out of *wagon* travel, and not out of any work he was required to do at home? And since there will be no answer to this,

---

[9] Neither is it unfair to retort that Mr. Wheeler (*Wheeler, supra* at 592, 593) "was not required by his employer" to crawl under the cottage for extension there of the wire connecting his television set with the television mast on the chimney. If, as Justices CARR, KELLY, and DETHMERS agreed in *Wheeler,* Mr. Wheeler was "engaged in a twofold purpose" with resultant right to compensation of his dependents, then the Brethren should advise why Mrs. Baas was not with like result carrying out "a twofold purpose" that morning. Her compensable right is a bit stronger, one would think, than was that of the Wheeler dependents.

is not the professional reader of our trisected opinions entitled to conclude that some seated here do heave and strain mightily at more and more midges, gnats, punkies, and no-see-ums[10] in effort to find more and more reasons for defeating what seems to be just compensation?

This should be enough, but that observation of my Brothers that Mrs. Baas was not required to travel by car calls for further treatment, humorous as well as serious. Now I find in the record and briefs no proof and no claim that she could have traveled from home to school in *any* way—*any* at all—excepting by automobile. There is no suggestion by anyone that public buses or jitneys, or street cars, or even an early morning passenger train, were either convenient or running conveniently between the vicinities of home and school (a little over 6 miles apart). The thought of airplane travel is a bit to the absurd, and she could not ride a bicycle on account of the extremely icy condition of the highways that day. But then, the inference of my Brothers considered, there may have been a livery stable handy with cutters (it being wintry, snowy and dangerously slippery) and horses for rent. And, yes, she could have walked, just as Jideon Punches could have walked; the only difference being that she had just 6 times the distance to cover, over ice and through snow, with books and papers carried by 1 arm and her lunch with thermos bottle carried by the other, while Jideon had only a mile to go, walking with the reins in his hands through the dew and the sunshine of a salubrious September morn. Too, considering her rugged ancestry and the fame of Hans Brinker, Mrs. Baas could have skated to school, towing her done work and prepared lunch on a sled, and thus the good lady could have avoided the

---

[10] "Ye blind guides, which strain at a gnat, and swallow a camel." (Matthew 23:24.)

risks (meanwhile accepting other and possibly more dangerous risks) of "automobile travel" and that callous legal brand my Brothers do now stamp upon her status. Yes, she probably "assumed the risk" of automobile travel that winter morning of 1958, not realizing that this Court was due in 1963 to read another tort concept of master and servant liability into the compensation act; a concept which supposedly was 1 of the salient reasons for adoption of this remedial act a half century ago.

*To conclude:* Her accident having occurred more than 5 years ago, and the issue not having been submitted here until 1963, Mrs. Baas lacks this year 1 vote only for deserving affirmance. The only victor is an insurer which is due to save medical, hospital, and nursing bills which, just for a part only of the initial 6-month statutory period, totaled $5,614.66, plus the sum of compensation payable for the statutory duration at the presently ordered rate of $40 per week. The only victim is the totally disabled Mrs. Baas, together with her 2 school-age dependent daughters. Today's result is, without doubt, another tragedy of that chronic disease of courts and tribunals. But for the ever brutal injustice of delayed justice, "it might have been" otherwise. It is not likely that the Court seated here in 1958 through 1960 would have ignored the "twofold purpose" rule.

Others will be duly warned by what they read here, but Mrs. Baas and her family will never forget what we do here. Schoolteachers will perceive at once that today's trisection will not—because it cannot—live long in the precedential annals of a Court that should know better; also, as to the meantime, that each of their class had best obtain, beforehand from the principal, a written order to take that work home for preparation and return to school, by some in-the-order specified means of travel. Such an order probably—I say "probably"—would over-

come the objections of habitual deniers of compensation.

Having reviewed the case again in the light of that which has been contributed by Justices O'HARA and SMITH, I am the more convinced that the appeal board was legally as well as sensibly right. As in *Wheeler, supra* at 594, I join the appeal board in quoting former Justice TALBOT SMITH as follows:

"An injury arises out of the employment if it arises out of the nature, conditions, obligations or incidents of the employment; in other words, out of the employment looked at in any of its aspects."

My vote to affirm is cast again.

O'HARA, J. (*concurring*). Justice SMITH and I regard it advisable to write separately. We address our short concurrence in the result reached by Mr. Justice KELLY to the persuasive opinion of Mr. Justice BLACK, with which we cannot completely agree.

Our associates both state the controlling question here to be whether plaintiff's injury arose "out of and in the course of" her employment. We agree. Mr. Justice KELLY depends chiefly on *Murphy* v. *Flint Board of Education*, 314 Mich 226, to support reversal. Mr. Justice BLACK relies particularly on *Punches* v. *American Box Board Co.*, 216 Mich 342, in support of affirmance. He footnotes that *Murphy* ignores *Punches.* We find no conflict in the cases.

In *Punches*, a teamster was injured while driving his assigned team from his home to his place of employment. His employer's foreman knew of and had approved of his practice in taking the team home to feed and tend them. The key finding by the industrial accident board was (p 349):

"Driving and tending this team was the work decedent was paid for."

In *Murphy*, a schoolteacher was injured while walking from school to her home. She was carrying books and examination questions on which she intended to work that evening. The decision recites (p 229):

"No claim is made that the fact that she was carrying the books and papers referred to contributed in any way to the injury she suffered."

The fact that both were traveling to or from work is not controlling. Justice Cardozo, quoted in *Murphy* at p 241 delineates:

"What concerns us here is whether the risks of travel are also risks of the employment. In that view the decisive test must be whether it is the employment or something else that has sent the traveler forth upon the journey or brought exposure to its perils."*

Mr. Justice BLACK, we believe, has erroneously made driving the team in *Punches* synonymous with driving the automobile here.

---

* *Marks' Dependents* v. *Gray*, 251 NY 90, 93 (167 NE 181).—REPORTER.

Actually in the case at bar, the automobile is a stranger to the issues. Plaintiff was not required by her employer to drive or travel by car. She was required by her employer to do work at home. Her accidental injury arose out of automobile travel, not out of the work she was required to do at home.

Absent some showing that the accidental injury in some way arose out of that work, we are constrained to agree with Mr. Justice KELLY.

SMITH, J., concurred with O'HARA, J.

### ON APPLICATION FOR REHEARING.

BLACK, J. *(dissenting from denial of rehearing).* There is but 1 way to account politely for the mysterious refusal of any 1 of the reversers of this award to acknowledge, *upon the record for all to see,* the existence of Michigan's "twofold purpose" rule.* It must be that Justices KELLY, DETHMERS, SMITH, and O'HARA "just haven't the time" to defend or explain, precisely upon peremptory challenge, their joint and several omission of reference to or discussion of "twofold" cases like *Anderson (Anderson* v. *Kroger Grocery & Baking Company,* 326 Mich 429) and *Wheeler (Wheeler* v. *Department of Conservation,* 350 Mich 590). My only comment is that, if this is the way manifestly pat cases (all cited in the opinions of present dissent) are supposed to be "sterilized," the operation will take much too long for the tenure expectancy of *all* Brethren seated here. The "twofold purpose" rule is firmly rooted in Michigan, as it is elsewhere, and that rule will survive as long as workmen's compensation is paid. None but the self-blinded can fail to perceive that more and more disablements arising from more and more risks, occasioned by the crescent taking home of work that must be readied for the morrow's task, will come before the appeal board and then rise to plague our Court as a result of its inexplicable decision denying compensation to this deserving and wholly disabled schoolteacher.

Four members of the Court having voted to grant this application for rehearing, it would seem that rudimentary respect for the viewpoints of others would call for something more than the stubbornness of standpattism. Or can it be that the Brethren of reversal fear they cannot write, plausibly or otherwise, some reason for reversal *all* reversers can agree upon?

I would rehear, and therefore dissent from denial of rehearing by equal division of our membership.

---

* "Twofold purpose" and "dual-purpose" are employed synonymously by the authorities. For copious citation see 371 Mich 637–654.